21 So.2d 327

**BALLARD & BALLARD CO. v. JONES.**

6 Div. 240.

Supreme Court of Alabama.

March 1, 1945.

Bradley, Baldwin, All & White, of Birmingham, for appellant.

Hugh A. Locke and Wade H. Morton, both of Birmingham, for appellee.

BROWN, Justice.

Trespass on the case by the consumer against the manufacturers of "Ballard's Self-Rising Obelisk Enriched" flour, manufactured from soft grain wheat produced in the Ohio Valley, in the manufacture of which "Vitamin $B_1$ (Thiamine) Nicotinic Acid-Iron-Calcium," and "Salt, Calcium, Phosphate, and Soda" are added. The case went to the jury on count A of the complaint, charging the defendant with negligence in allowing arsenic to be mixed in the flour during the process of its manufacture; and the defendant's plea of not guilty, pleaded in short by consent, with leave to give in evidence any matter that would constitute a valid defense to the action.

The evidence adduced by plaintiff goes to show that her husband purchased from "The Great Atlantic and Pacific Tea Company," a retailer selling food stuffs in Columbus, Georgia, a sack of such flour, which when purchased was in the original sack which had not been opened. The sack so sealed was carried to his residence for the use and sustenance of his family, including the plaintiff, his wife. The sack was in good condition, without holes or perforations of any kind, of substantial cotton sacking material, manufactured by defendant for the purpose for which it was used. That plaintiff and other members of her family were poisoned by biscuits made from such flour. That plaintiff's family consisted of her husband, two small children and her brother, all of whom became ill, after partaking of biscuits made from the flour. That plaintiff was enceinte, and was made ill, nauseated and caused to vomit, that her eyes were inflamed and swollen, and she still suffers from inflammation of her eyes. That she was ill until after the birth of her child, some ten or more days later. The plaintiff's evidence further goes to show that the flour was brought home and placed in the kitchen pantry, located just off of the kitchen, on a table; that plaintiff opened the sack, took sufficient flour therefrom to make a batch of biscuits. After the flour bin had been thoroughly dusted out the sack was emptied into the flour bin, so that the bottom of the flour in the sack was at the top of the bin, and the lid was closed and kept closed until some few days later, after the family had recuperated, and another batch of flour was taken from the top of the flour in the bin, from which biscuits were made, with result that plaintiff and other members of the family were again made ill, and upon consulting a phy-

sician, they were advised that they had been poisoned.

The plaintiff's evidence further goes to show that a sample, about a pint, of this flour was taken from this bin in a glass jar and delivered to Dr. Rehling, the toxicologist at Auburn, who made an analysis thereof, and discovered in the flour a white fleecy substance, not detectable with the naked eye, but on analysis proved to be calcium arsenate. That there was a sufficient amount of arsenic in a quart of such flour to make a fatal dose for ten people, if absorbed, and not thrown off through vomiting. The plaintiff's evidence further goes to show that there was no calcium arsenate on the premises. That the flour and foodstuffs were kept in the pantry away from the closet or room in which medicines were kept, and in this place was kept borax, a white powder used for killing roaches, and a powder known as "derris" used for making a solution to spray vegetables. That neither borax nor derris was poisonous to human beings. Derris, according to some of the evidence, was green, and according to other evidence, was brown. A part of the first batch of biscuit dough made from the flour was put into the ice box or refrigerator, and it turned green, and was thrown away.

The defendant offered evidence going to show that its representative obtained from Mrs. Jones, the plaintiff, a sample of the flour, and, according to her evidence, said representative was present and saw her take it from the flour bin. This, however, was denied by defendant's representative, who testified that he did not see the plaintiff take the sample of flour from the bin, that she brought it to him in the jar. On being analyzed by the defendant's chemists, calcium arsenate was found in the sample, which, according to his testimony, was colored green, and in some of the small lumps the quantitative analysis showed about 50% arsenic. That commercial arsenic used for poisoning is colored green, so as to distinguish it as a poison. The defendant's evidence further showed that in the phosphate used as a self-rising ingredient mixed in the flour in the course of manufacture there is a trace of calcium arsenate. That it purchased said phosphate from a reputable manufacturer, and in the course of the preparation and manufacture of the phosphate to be used for enriching flour, which said manufacturer furnished to manufacturers of flour, the arsenic in

the phosphate is refined out so as to reduce it to a non-deleterious state, not harmful when consumed by human beings. The defendant's evidence also shows that such manufacturer of phosphate also uses lime in the manufacture of phosphate which also contains traces of arsenic, and that there is no method of eliminating such arsenic from the lime.

The defendant's evidence further goes to show that it has engaged in the business of manufacturing flour for sixty odd years and that it uses in its business the most modern equipment and machinery, which includes a mixer used for distributing the enriching materials through the flour. This mixer consists of a drum or compartment through which a revolving shaft runs, and attached to this shaft are what the witness Whiting, the mill operator, referred to as ribbons or paddles, making about sixty revolutions a minute. The enriching ingredients, including the phosphate, are taken from a box where they are kept, and put into the mixer by hand or scoop, by lifting the lid of the mixer and placing therein approximately 27 pounds of phosphate to each 1,703 pound batches of flour. The flour comes into the mixer through the weigher, which is a part of the elevator system, and is mixed in batches and sacked. During the process of mixing numerous tests are made, by lowering small glass or dipper into the opening through which the enriching materials are introduced by hand, and samples taken out and tests made to determine whether the blending is satisfactory; but no test is made to determine whether or not deleterious substances are contained in the mixture.

The enriched flour goes directly from the mixer back into the packer and to the sack fastened over the outlet of the packer. The sack of flour is then removed by hand to the scales and weighed, and if not of full weight—70 pounds—loose flour is taken by hand from a bin or box with scoop, and flour added until the sack of flour attains full weight.

No affirmative evidence was offered going to show the condition of the mixing machine, the ribbons and paddles attached to the shaft at the time the batch of flour from which the sack of flour involved was taken, although by numbers written on each sack the defendant, according to its testimony, was able to identify each sack of flour made from each batch, each sack being dated and record kept. Defendant's

evidence further goes to show that this is the only complaint it had arising from flour mixed on the day this sack was mixed and sacked, the 18th of February, 1942.

Printed on the bag or sack identified and offered in evidence from which the flour used by the plaintiff was taken is the following: "The economical energy ·of Obelisk Self-Rising Flour is enriched by the addition of protective, healthful vitamins and minerals. In 6-½ ounces (the average daily consumption of flour) Obelisk Enriched Self-Rising Flour supplies not less than the following proportions of the minimum daily requirement, Vitamin $B_1$ (thiamine) 67%, Iron 24%, Calcium 80%, Niacin 2.44 mg. Vitamin $B_1$—220 Int. Units. Niacin, 2.44 mg. Iron, 2.44 mg. Calcium 600. mg."

The defendant's evidence further goes to show that the amount of arsenic contained in the phosphate which it used in the manufacture of its self-rising flour was less than the allowance under government regulations.

The contention of appellant here is that its evidence presented an iron clad complete defense and overcame the inference or presumption of negligence arising from the fact that calcium arsenate in deleterious quantities was found in the flour, and that it was entitled to have a directed verdict, through the general affirmative charge in its favor.

"Although there are some decisions denying recovery by a consumer from a manufacturer for injuries from food or beverages purchased through the medium of a retail dealer, the decided weight of authority is to the effect that an ultimate consumer who purchases, from a retailer or middleman, food products or beverages prepared by a manufacturer or packer, such as those put up in bottles, sealed cans or sealed packages, may bring an action directly against the manufacturer or packer for injuries resulting from the use of such foods and beverages which prove to be unwholesome and unfit for human consumption, even though there is no contractual relation between the consumer and the manufacturer or packer. The superior position of the manufacturer in respect of knowledge, and opportunity for knowledge, of the contents of the cans and of the processes of manufacture seems to have strongly influenced the courts in holding him liable, irrespective of the theory upon which a particular action is based.

"Where the manufacturer puts the goods upon the market in sealed cans or packages, he in effect represents to each purchaser that the contents of each can or package are suited to the purpose for which such can or package is sold. Under these circumstances, the fundamental condition upon which the common-law doctrine of caveat emptor is based is conspicuously absent; for the buyer has no opportunity to look out for himself. When he thus buys and eats the contents of the package, relying upon the assurance of the manufacturer that they are fit to be eaten, it seems to result from general and fundamental principles that he has a right to insist that the manufacturer shall at least exercise care that they are so fit, and not unwholesome and poisonous. * * *." 22 Am. Jur. p. 890, § 104.

The evidence adduced by the plaintiff clearly authorized an inference, which it was the province of the jury to draw, that the calcium arsenate found in the flour by Dr. Rehling was there in consequence of defendant's negligence, and placed upon it the duty of going forward with the evidence to rebut or overcome such inference. Dr. Pepper Co. v. Brittain, 234 Ala. 548, 176 So. 286.

While it may be conceded that the repeated tests made of the flour while it was going through the mixer authorized an inference that the mixing apparatus was in good conditon and without defects, the drawing of such inference was within the province of the jury. There was no affirmative evidence that it was free of defects. The burden to show this was on the defendant, because of its superior knowledge in respect thereto. Louisville & N. R. R. Co. v. Marbury Lumber Co., 125 Ala. 237, 28 So. 438, 50 L.R.A. 620;· Collins Baking Co. v. Savage, 227 Ala. 408, 150 So. 336.

The court did not err in refusing the affirmative charge requested by the defendant in writing. Nor did the court err in overruling the defendant's motion for a new trial. Cobb v. Malone, 92 Ala. 630, 9 So. 738.

The complaint not only claimed damages for physical injuries but for mental pain and anguish, and the circumstances attending plaintiff's illness were such as to warrant the jury in award of damages for mental anguish, as well as for physical suf-

fering. Luguire Funeral Home v. Turner, 235 Ala. 305, 178 So. 536.

Defendant's special charges made the basis for assignments of error four and five are abstract, and had tendencies to lead the mind of the jury away from the real issue and were argumentative and were refused without error.

We find no reversible error.

Affirmed.

GARDNER, C. J., and LIVINGSTON and SIMPSON, JJ., concur.