Fred McLAUGHLIN,
Appellant (Plaintiff),

v.

MICHELIN TIRE CORP., a New York corporation, and Cobre Tire, a division of Fletcher Enterprises, an Arizona corporation, Appellees (Defendants),

Caterpillar Tractor Co., a California corporation; Wyoming Machinery Company, a Utah corporation; Larry Largent; Larry McNabb; Robert Dernovich; Dennis Veeder; and Craig Paisley, Defendants.

No. 87–61.

Supreme Court of Wyoming.

July 12, 1989.

Richard H. Honaker, Rock Springs, and W. Keith Goody, Jackson, for appellant.

Carl L. Lathrop, Lathrop & Uchner, P.C., Cheyenne, for appellee, Michelin Tire Corp.

William G. Walton, Cheyenne, for appellee, Cobre Tire.

Before CARDINE, C.J., THOMAS, URBIGKIT and MACY, JJ., and BROWN, J., Ret.

THOMAS, Justice.

In this case, the court is asked to address the several theories for imposing liability upon a manufacturer or seller of heavy equipment tires in the context of summary judgment. A critical question is whether there is any difference in the application of those several theories in the absence of an actual defect in the tires. We also address a collateral theory of independent negligence. The trial court entered a summary judgment in favor of Michelin Tire Corp. (Michelin) and Cobre Tire (Cobre) on the premise that there was no genuine issue of material fact, and these defendants were entitled to judgment as a matter of law. The trial court emphasized the failure of the plaintiff to produce any materials in opposition to the motion for summary judgment that raised an issue of fact as to whether there was any defect in the tires. We affirm the judgment of the district court on the theories of negligent manufacture and design, strict liability, breach of an implied warranty of merchantability, and breach of an express warranty. Because there do exist genuine issues of material fact, we reverse the summary judgment as to the theory of an implied warranty of fitness and as to the theory of independent negligence of Michelin and Cobre in not replacing the tires when they were not performing in a satisfactory manner.

Fred McLaughlin was injured on April 5, 1983, when he lost control of a Caterpillar scraper he was operating at the Jim Bridger Coal Company mine in Sweetwater County. He brought an action to recover damages for his injuries in which he named as defendants Caterpillar Tractor Co., Wyoming Machinery Company, Michelin Tire Corp., Cobre Tire, Larry Largent, Larry McNabb, Robert Dernovich, Dennis Veeder, and Craig Paisley. In his complaint, McLaughlin alleged that his injuries resulted from his loss of control of the scraper due to severe bouncing and vibration caused by Michelin radial tires that had been installed on the machine. As theories

of liability of the several defendants, McLaughlin alleged negligence, strict products liability in tort, breach of the implied warranties of fitness and merchantability, and breach of an express warranty. McLaughlin settled his claims against all defendants except Michelin and Cobre, and the trial court ultimately entered summary judgment against McLaughlin and in favor of Michelin and Cobre. The appeal is taken from that summary judgment, which was a final order under the circumstances.

In his brief, McLaughlin states the question to be:

"Do material issues of fact exist in this case which require reversal of the summary judgment entered below with regard to:

"(a) Appellant's negligence claim;

"(b) Appellant's strict liability claim; and

"(c) Appellant's breach of warranty claims?"

Michelin, in its Brief of Appellee, expands on those issues and sets them forth in this way:

"I. Whether appellants have infused new issues for the first time on appeal which were not considered by the court below?

"II. Must plaintiff prove a defect regardless of the theory, be it negligence, strict liability or implied warranty?

"III. Do subjective complaints by operators prove a defect?

"IV. Is the circumstantial evidence test available?

"V. Does the evidence submitted by plaintiff in opposition to the motion for summary judgment invite the jury to speculate and thereby fail to raise a triable issue of fact?

"VI. Did Michelin have a duty to warn?

"VII. Even as to new matter not raised below, does a triable issue remain?"

Cobre invokes a third version of the issues stated as follows:

"Did the court err in determining that there exists no issue of material fact and that defendants (appellees) were entitled to judgment as a matter of law?"

"1. May appellant raise new issues on appeal?

"2. Must appellant prove the tires were defective?

"3. Did Cobre have a duty to warn appellant?

"4. Was summary judgment proper?"

From the materials in the record, most of which were relied upon in connection with the motion for summary judgment, the essential facts can be gleaned. In March of 1983, Cobre and Jim Bridger Coal Company (Bridger) entered into a contract for goods and services pursuant to which Cobre agreed to provide Bridger with eighty percent of its requirements for tires and accessories and to furnish on-site tire maintenance personnel. In discussing its tire needs, Bridger, through its agent, Jack Erickson, mentioned to Cobre's agent, Kenneth Moe, that Bridger was interested in trying steel-belted radial tires on their Caterpillar 631–D scrapers to see if that would provide a smoother, more comfortable ride for the scraper operators. Until that time, the scrapers uniformly had been equipped with bias ply tires.

On March 10, 1983, in accordance with the contract, and pursuing Michelin's advice, Cobre delivered to Bridger two 33.25 × 35 Michelin XRDN** steel-belted radial tires and installed them on the front of a Caterpillar 631–D scraper, No. 699. The record discloses that Cobre relied almost exclusively on Michelin's recommendations as to the suitability of any tires that Michelin manufactured for use on particular pieces of equipment and in certain types of terrain. Scraper No. 699 had been equipped with bias ply tires manufactured by another tire company prior to the installation of the Michelin tires. Immediately after installation of these tires, McLaughlin, who usually operated Scraper No. 699, became aware of extreme differences in its operation. McLaughlin complained to his supervisor, Jack Erickson, that the scraper, now equipped with the new Michelin tires, was racked with extreme and violent vibrations, that it would bounce and shake excessively, and that the bouncing did not subside as quickly as it had when the

scraper had been equipped with the bias ply tires. Another operator stated that Scraper No. 699 "vibrated more with the new Michelin tires," and that the operators were "getting beat up in the scraper." Still another operator observed that the ride in the scraper was "rough and it vibrated and it wouldn't smooth out." This latter operator further observed that the Michelin tires caused the scraper to bounce more after an initial bounce than it had with the bias ply tires. A fourth operator testified that the Michelin radial tires were "bouncier" than the bias ply tires.

McLaughlin's complaints, and those of the other operators of the scraper, were communicated to Cobre, which in turn passed them on to Michelin. Despite the voluminous complaints that continued over a period of twenty-six days, neither Cobre nor Michelin took the tires off the scraper. Instead, an attempt was made to cure these problems by varying the air pressure in the tires. This did not provide a remedy, and the extreme vibrations and bouncing continued. Late in March of 1983, Cobre and Michelin decided that on April 10, 1983 they would permanently remove the tires. In the intervening period, an experiment was conducted that involved taking the tires from Scraper No. 699 and installing them on another scraper. The same problems of vibration and bounce occurred with the tires on the second scraper. Following the experiment, these tires were re-installed on Scraper No. 699.

In accordance with Cobre's and Michelin's decision, the tires were still on Scraper No. 699 on April 5, 1983. On that date, McLaughlin, who was an experienced heavy equipment operator, was making a dirt haul pass over a ditch. Straddling the ditch while making such dirt haul passes to dump overburden, in the manner that McLaughlin did on the day of his injuries, was a "very accepted" practice at the coal mine, and "[t]here is no risk involved" with such a procedure. During one such pass, the scraper suddenly went into a violent series of vibrations in the course of which McLaughlin lost control of the scraper and was thrown through the side window of the cab. McLaughlin sustained severe lacera-

tions to his face, which ultimately cost him his right eye, and compression fractures to the vertebrae in his back that resulted in permanent disability.

The parties dispute what actually occurred just prior to the accident to cause the scraper to vibrate so severely. McLaughlin's co-workers stated in substance that they believed something was wrong with the tires. One related:

"* * * [H]e was bouncing * * *. I seen the tires on six-nine-nine going flat. When he was running over this dump area, they were going flat, and I was going to catch him. * * * I was trying to flash him over. I tried to stop him, but he was ahead of me."

The same co-worker went on to say that "both wheels were coming off the ground," that the tires were flattening to such an extent that the distance from the rim to the bottom of the tire was only about six inches, and that when the tires would spring back, the distance from the rim to the bottom of the tire would be about two and one-half feet. Another co-worker observed the actual injury occur, and he reported in his deposition:

"* * * I could see the scraper bouncing real hard. I saw it bounce three or four times * * *. I saw him go sideways * * *. Then I saw him come back and saw his head come through the door, the window, and knock that window clear out."

After McLaughlin's accident, several tests were conducted with the scraper that re-confirmed the beliefs of the several operators that the tires caused the accident. Agents of Michelin and Cobre also witnessed the tests, but none of them would offer an opinion as to what caused the accident. Instead, they reported that it appeared that the drivers of the scraper during the course of the tests manifested bad attitudes.

The record also incorporates the opinions of experts. One said:

"* * * I am of the opinion that there was no defect in either design or manufacture of the Michelin tires installed

upon Unit 699 upon which Mr. McLaughlin was injured."

Another expert whose deposition was taken by the plaintiff said he did not know whether there was a defect in manufacture of the tires and that it really did not matter. What he recognized was that excessive vibration apparently occurred and that it was attributable to these tires.

In his Complaint and Jury Demand, McLaughlin asserted, as theories of recovery against the several defendants, including Michelin and Cobre, negligence, strict liability in tort, breach of the implied warranties of fitness for a particular purpose and merchantability, and breach of express warranty. The facts set forth above are a product of extensive pre-trial discovery. Following that discovery, Michelin and Cobre presented motions for summary judgment, together with supporting affidavits, deposition excerpts and their memoranda of law. McLaughlin filed a memorandum in opposition to those motions together with the deposition excerpts and exhibits upon which he relied. The district court then issued its opinion letter granting the motions for summary judgment on all issues, and that determination was formalized by an Order for Summary Judgment entered on December 8, 1986. This appeal is taken from that order.

■ The summary judgment granted to Michelin and Cobre can be sustained only if there is no genuine issue of material fact, and the prevailing party is entitled to judgment as a matter of law. *Matter of Estate of Roosa,* 753 P.2d 1028 (Wyo.1988). A material fact is one that establishes or refutes an essential element of a cause of action or a defense asserted by a party. *Roosa.* If the moving party presents supporting summary judgment materials that demonstrate that no genuine issue of material fact exists, the burden is shifted to the non-moving party to present appropriate supporting materials that serve to pose a genuine issue of a material fact for trial. *Roosa.* On appeal, this court examines the entire record in the light most favorable to the party who opposed the motion, affording to that party all favorable inferences

that may be drawn from the materials either supporting or opposing the motion. *Roosa.* We have examined this record in that light.

We are unable to support the determination of the trial court that summary judgment was proper with respect to all of the theories asserted by McLaughlin. It is desirable, although perhaps not essential, that we explain the justification for affirming the summary judgment as to the theories of negligent manufacture and design, strict liability, breach of an implied warranty of merchantability, and breach of an express warranty. We conclude that genuine issues of material fact are present with respect to the theories of negligence in failing to remove the tires after their performance had been evaluated, and breach of an implied warranty of fitness for a particular purpose. We reverse the summary judgment as to those theories only.

■ In Wyoming, the elements of a negligence claim are: (1) a duty; (2) a violation of the duty; (3) proximate causation; and (4) an injury. *Caterpillar Tractor Co. v. Donahue,* 674 P.2d 1276 (Wyo.1983), citing *McClellan v. Tottenhoff,* 666 P.2d 408 (Wyo.1983). In a products liability action premised on negligence, which is alleged here, the plaintiff must prove that the manufacturer, seller, or distributor breached a duty of care owed to him and thereby proximately caused him to be injured. 1 American Law of Products Liability 3d § 10:1 (1987).

Wyoming also has adopted the doctrine of strict liability encompassed in the Restatement (Second) of Torts § 402A (1965). The rule there is stated:

"*Special Liability of Seller of Product for Physical Harm to User or Consumer*

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

*Ogle v. Caterpillar Tractor Co.*, 716 P.2d 334 (Wyo.1986). See also *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871 (Alaska 1979); Prosser, *The Assault Upon the Citadel* (Strict Liability to the Consumer), 69 Yale L.J. 1099 (1960); Restatement (Second) of Torts § 402A comment c; and *Sims v. General Motors Corp.*, 751 P.2d 357 (Wyo.1988).

While the duties that are owed by defendants under a negligence theory in a products liability suit may vary, all relate to the reasonableness of the defendants' conduct. A "manufacturer * * * is required to exercise reasonable care in the planning, designing, and manufacturing of a product in order to ensure that it is reasonably safe to use." *Donahue*, 674 P.2d at 1280 (citing *Maxted v. Pacific Car & Foundry Co.*, 527 P.2d 832 (Wyo.1974)). The duty of the seller or distributor is simply to exercise that care which a reasonably prudent person would under the same circumstances. 1 American Law of Products Liability 3d § 10:14.

■ Thus, in pursuing a theory of negligent design or manufacture, the conduct of the maker or seller is in question. On the other hand, in pursuing a theory of strict liability, the focus is on the product itself. *Beck*, 593 P.2d 871; *Gonzales v. Caterpillar Tractor Co.*, 571 S.W.2d 867 (Tex. 1978), on remand 599 S.W.2d 633 (Tex.Civ. App.1980). Pursuant to the theory of strict products liability, a seller or distributor can be liable for injury or loss resulting from a defective product that entered the stream of commerce in the absence of fault, while, under a negligence theory, fault on the part of the manufacturer, designer, or dis-

tributor is an element that must be established for an injured party to recover. *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049 (1963); *Phillips v. Kimwood Machine Co.*, 269 Or. 485, 525 P.2d 1033 (1974). Also see *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). Strict products liability is invoked, and is intended to apply, in those instances in which traditional theories of negligence are inadequate or where it is practicably impossible to prove negligence. W. Prosser & W. Keeton, The Law of Torts § 98 (5th ed. 1984). Moreover, strict liability often is a more realistic theory of recovery than that of contract-warranty when a person suffers physical harm from a product that is dangerous if defective. See *Yuba*.

Despite these several distinctions, the widely recognized rule is that:

"The requirement of showing a defect is one element common to every products liability case, whether it is brought on a theory of negligence, breach of an express or implied warranty, strict tort liability, or a combination of theories." W. Kimble & R. Lesher, Products Liability § 53 at 69 (1979).

The burden under this rule is upon the plaintiff to demonstrate a defect in fact, i.e., that the product failed. The record in this case does not establish any genuine issue of material fact as to product failure. It is silent with respect to any facts, introduced by McLaughlin or any other party, that indicate negligent manufacture or negligent design resulting in a failure of the tires or that justify an inference from any failure that would support strict liability. This case readily fits within the theory of *Buckley v. Bell*, 703 P.2d 1089, 1095 (Wyo. 1985), in which, citing *Baptista v. St. Barnabas Medical Center*, 109 N.J.Super. 217, 262 A.2d 902 (1970), aff'd 57 N.J. 167, 270 A.2d 409 (1970), and referring to *Berkeley Pump Co. v. Reed–Joseph Land Co.*, 279 Ark. 384, 653 S.W.2d 128 (1983); *Montez v. Ford Motor Company*, 101 Cal.App.3d 315, 161 Cal.Rptr. 578 (1980); and *Dambacher by Dambacher v. Mallis*, 336 Pa.Super. 22,

485 A.2d 408 (1984), this court articulated the proposition that "a wrong product is not a defective product for purposes of strict liability."

In the absence of some evidence to show a defect in these tires, the summary judgment in favor of Michelin on the alleged theories of negligence in manufacture or design and strict liability must be sustained. To the extent that those theories could be asserted against Cobre, they fail for the same reason. It is clear that the trial court was correct in granting summary judgment as to those theories of liability.

■ We also sustain the summary judgment as to the alleged theories of breach of an express warranty and an implied warranty of merchantability. Section 34–21–230, W.S.1977, articulates the requirements for express warranty. It provides, in pertinent part:

"(a) Express warranties by the seller are created as follows:

"(i) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise; * * *."

Scrutiny of this record discloses neither an affirmation of fact nor a promise by Michelin to Cobre, Cobre to Bridger, or Michelin to Bridger sufficient to support a factual issue as to the existence of an express warranty as defined in the statute. At the very most, the record might support an inference that Michelin represented that the tires were good and had been used successfully on prior occasions. These statements fit within the definition found in § 34–21–230(b), W.S.1977, that "a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." See *Terry v. Moore*, 448 P.2d 601 (Wyo.1968). The entry of summary judgment on the claim of an express warranty must be sustained.

■ The implied warranty of merchantability is incorporated in § 34–21–231, W.S. 1977, that provides, in pertinent part:

"(a) Unless excluded or modified (section 2–316 [§ 34–21–233]), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. * * *

"(b) Goods to be merchantable must be at least such as:

"(i) Pass without objection in the trade under the contract description; and

"(ii) In the case of fungible goods, are of fair average quality within the description; and

"(iii) Are fit for the ordinary purposes for which such goods are used; and

"(iv) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

"(v) Are adequately contained, packaged, and labeled as the agreement may require; and

"(vi) Conform to the promises or affirmations of fact made on the container or label if any."

While it has been held in some jurisdictions that proof of a defect is not required in an action premised on express warranty, based upon a rationale that the mere failure of the promised performance is sufficient, 2 American Law Products Liability 3d, §. 19:28, this court has held in *Colorado Serum Company v. Arp*, 504 P.2d 801 (Wyo.1972), that proof of a defect is essential under both express and implied warranties. This is consistent with the general rule set forth above and, because the record does not establish a defect in these tires, the district court properly granted summary judgment as to the theory of implied warranty of merchantability as well as express warranty.

■ The case of *Valentine v. Ormsbee Exploration Corp.*, 665 P.2d 452 (Wyo. 1983), serves as an appropriate bridge to those theories upon which the court concludes a genuine issue of material fact does exist and that result in reversal. This court said in that case:

"'Proof of the specific defect in construction or design causing a mechanical

malfunction is not an essential element in establishing breach of warranty. "When machinery 'malfunctions,' it obviously lacks fitness regardless of the cause of the malfunction. Under the theory of warranty, the 'sin' is the lack of fitness as evidenced by the malfunction itself rather than some specific dereliction by the manufacturer in constructing or designing the machinery." [Citations.]' *MacDougall v. Ford Motor Company,* 214 Pa.Super. 384, 257 A.2d 676, 679 (1969)." *Valentine,* 665 P.2d at 462.

*Valentine* was a contract case that applied traditional concepts of an implied warranty of merchantability or an implied warranty of fitness for a particular purpose without invoking tort theories of negligence and strict liability. *Valentine* establishes that the actual failure of a product serves to demonstrate a breach of implied warranty of fitness for a particular purpose.

In 1 M. Madden, Products Liability, § 5.11 at 160 (2d ed. 1988), the following statement is found:

> "The warranty of fitness for a particular purpose may be breached even though the goods sold are not 'defective' in the usual sense. Although many of the cases which rest recovery for the buyer on this warranty do in fact deal with products that are for one reason or another 'defective,' such a condition is not required. Provided the conditions exist which give rise to the warranty, it may be breached when a product properly made and merchantable is simply the wrong one for the buyer's particular use."

The last sentence of this quotation aptly describes this case. While breach of the implied warranty of fitness can be established by proof that the product is defective in fact, with respect to this theory of liability, the product can be one that is defective as a matter of law. The implied warranty of fitness of a product for a particular purpose requires only an error in merchandising.

■ Section 34–21–232, W.S.1977, is the provision in Wyoming's Uniform Commercial Code that adopts implied warranty of fitness for a particular purpose, and it provides:

> "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

The elements of a cause of action under this theory are: (1) knowledge on the part of the seller of the purposes to which the goods will be put; (2) some reason for the seller to know that the buyer is relying on the seller's skill and judgment; and (3) there must be *actual reliance* on the part of the buyer on the seller's skill and judgment. J. White & R. Summers, Uniform Commercial Code § 9–9 at 358 (1980).

■ In cases involving an implied warranty of fitness, the proof of a "defect" assumes an entirely different character than the proof found under a negligence or strict liability context in which there must be proof of a defect in fact. Under the theory of implied warranty of fitness, if the product malfunctions when it is being used in the manner in which it was intended by the consumer, assuming that the intended use was communicated to the seller, there is a breach of implied warranty of fitness for a particular purpose that does permit recovery on behalf of the injured party. The failure to function satisfactorily coupled with fulfillment of the other statutory requirements of the cause of action found in § 34–21–232, W.S.1977, that is, knowledge on the part of the seller and reliance on the part of the consumer, results in a "defect" as a matter of law sufficient to justify recovery to one who is injured as a result of that malfunction. That defect exists not in the product itself but in the conduct of the seller in furnishing a product that simply was the wrong one for the buyer's particular use. As McLaughlin correctly points out in his reply brief:

> " 'Under the [statutory] theory of [implied] warranty [of fitness for a particular purpose], the "sin" is the lack of

fitness as evidenced by a malfunction itself rather than some specific dereliction by the manufacturer in constructing or designing the machinery.' " *Valentine,* 665 P.2d at 462.

■ The material facts in issue then are whether: (1) Bridger communicated to Michelin and Cobre the purpose for which the tires were purchased; (2) Michelin and Cobre knew Bridger was relying on the particular skill and judgment of Michelin or Cobre when purchasing a tire; and (3) the tires, in fact, malfunctioned. Examining the summary judgment materials in the light most favorable to McLaughlin, as we are required to do, there are genuine issues of material fact as to each of those questions. Cobre and Michelin both knew that Bridger intended to use the Michelin steel-belted radial tires on their scrapers. In January of 1983, Cobre's division manager, Kenneth Moe, went to the Bridger mine to discuss with Jack Erickson, McLaughlin's supervisor, a change in the type of tire used on scrapers at the mine site. We find the following colloquy in the deposition of Kenneth Moe, relating to a conversation that took place at the Bridger mine between Moe and Erickson:

"Q. Do you remember who first brought up the question of using radial tires at the mine?

"A. Jack [Erickson] indicated that they wanted to try them, that they had run radials on all their other equipment up to this point but had not tried it on the scrapers.

"Q. Did he specifically indicate that he wanted to try the radials on the scrapers as opposed to other types of equipment?

"A. They were already running radials on all the other equipment.

"Q. Did Jack Erickson request a particular brand of radials?

"A. He said radials.

"Q. And he didn't specify either a brand or a model number; is that correct?

"A. That is correct.

\* \* \* \* \* \*

"Q. Other than Jack Erickson's request for the use of radial tires on scrapers, do you remember any other specifics of your conversation with him at that time?

"A. Other than they weren't satisfied with the performance that the fabric tires were giving at that time, was the only other thing, and that was one of the reasons they wanted to try the radials."

Concerning knowledge of Bridger's intended use, Cobre admits in its brief that discussions took place between Cobre and Bridger regarding the use of steel-belted radials on the scraper. Furthermore, Cobre indicates in its brief that Moe contacted Michelin's district earth mover salesman, Gary Workman, and relayed to him the information that Cobre had received from Bridger. As to the particular scraper upon which the Michelin tires would be installed, Moe said, in his deposition:

"Q. Did you, or to your knowledge any other employees at Cobre Tire, including but not limited to Larry Farwell, make a determination before the McLaughlin accident as to which 631–D scraper to put the Michelin tires on and which 631–D scraper to put the Bridgestone tires on?

"A. Under its maintenance procedures there, Bridger supplies us with an MR, maintenance request, when a machine is ready for tires. In this case I imagine that this machine [Scraper No. 699] was the one that was ready for the first tires."

Evidence does exist from which a jury could infer that Cobre and Michelin both knew, by virtue of information communicated from Bridger, the particular use to which these tires would be put.

It also is possible to infer, favorably to McLaughlin, that Bridger relied upon Michelin's and Cobre's skill and judgment in selecting the particular tires to use. The evidence shows that Bridger merely indicated it wanted to try steel-belted radials on the scrapers. It did not indicate a brand or model of tires. Bridger relied on the expertise and knowledge of Cobre and Michelin to decide which tires would be appropriate for use on the scraper. It was a joint decision by Cobre and Michelin to provide and install the particular Michelin tires what were on scraper No. 699 when

McLaughlin was injured. Bridger Coal, in reliance upon the expertise of Michelin and Cobre, acquiesced in the installation of these tires. For example, Cobre says in its brief:

"* * * Cobre's division manager, Kenneth Moe, consulted Gary Workman, the Michelin district earth mover sales manager who was familiar with soil conditions encountered by scrapers at the mine. Workman recommended using Michelin XRDNA** steel belted radials and Moe followed his recommendation."

Workman testified, in his deposition, that his knowledge of the conditions of the mine site was based on various on-site inspections and also upon inspection of used bias ply tires previously installed on the scrapers for the installation of the Michelin tires.

With respect to malfunction, the record is replete with information tending to demonstrate that the tires, at the very least, functioned in a manner entirely different from other tires used on the scraper. Witnesses for both sides testified as to an increase in the bouncing and vibration to which the scraper was subjected when equipped with the Michelin tires. These witnesses do disagree as to the ultimate effect of the vibrations and bouncing on the scraper, but there is, at least, evidence of a change in the operational characteristics of the scraper with Michelin tires. The occurrence of the accident itself is some evidence that could support an inference by the finder of fact that these tires malfunctioned. We also note the following in the testimony of Dale Bussman, an expert selected by McLaughlin, with respect to whether the tires were fit for the particular purpose intended by Bridger:

"Q. So your opinion, apparently, is not going to be that the tire was defectively designed or manufactured?

"A. That's correct.

    *    *    *    *    *    *

"A. Yes, you would have vibration regardless of the type of tire. *It's just that in this particular case we had a defective tire that was on this machine and it gave excessive vibration which resulted in a loss of control.*

"Q. Are you changing your testimony? You told me you didn't have an opinion as to the tires being defectively manufactured or designed. Are you now telling me that there's a defect in the manufacture or design?

"A. No, *what I'm saying is that these particular tires were—is was the wrong application for the tire.*

"Q. What you're saying is it's the wrong choice of tire for this application?

"A. Yes.

"Q. But the design itself is not subject to your criticism, it's just what they did with this tire?

"A. Yes. Now, relative to the question of whether it was a defective manufacture, I mean, maybe—and I don't know this, and it really doesn't matter, because we know the tire gave the excessive vibration in this particular case—perhaps it was defectively manufactured, okay, I don't know that. And I really don't care. All I know is that the tire gave excessive vibration which resulted in the loss of control." (emphasis added)

We conclude that this record encompasses evidence with respect to every element of a claim for breach of the implied warranty of fitness for a particular purpose, which structures genuine issues of material fact. In the provisions that are incorporated in Wyoming's Uniform Commercial Code, particularly in §§ 34–21–232, 34–21–235, and 34–21–294(b), W.S.1977, our legislature adopted a remedy which applies in McLaughlin's situation. In light of the information found in the summary judgment materials in the record in this case, this remedy clearly fits the facts. There are genuine issues as to these facts, and summary judgment should not have been granted as to this theory of recovery.

■ We also are satisfied that there do exist genuine issues of material fact with respect to the question of negligent failure to remove the tires. Michelin and Cobre assert, as a preliminary matter, that this theory should not be considered by this court because McLaughlin failed to raise it before the trial court. It is true that this

court will not consider questions raised for the first time on appeal, *Valentine*, 665 P.2d at 462, but scrutiny of this record discloses that McLaughlin presented the theory of negligent failure to remove the tires to the trial court.

Negligence cases usually involve mixed questions of law and fact concerning the existence of a duty, that is the standard of care required of a reasonable person, and proximate cause, and such cases ordinarily are not susceptible to summary adjudication. *Kobielusz v. Wilson*, 701 P.2d 559 (Wyo.1985) (citing *Keller v. Anderson*, 554 P.2d 1253 (Wyo.1976)). See also *O'Donnell v. City of Casper*, 696 P.2d 1278 (Wyo. 1985). The allegation by McLaughlin that Michelin and Cobre were negligent in failing to remove the tires presents only a simple claim of negligence, as opposed to a products liability claim. The question is whether it was reasonable for Michelin and Cobre to fail to remove the tires in light of the information it had about their unsatisfactory performance.

Under this theory of recovery, it would be material whether Michelin and Cobre knew of McLaughlin's complaints and Bridger's dissatisfaction with these tires. The complaints about the poor operational characteristics of the tires spanned a period of twenty-six days, and those complaints could persuade a trier of fact that a reasonable person would have removed the tires before McLaughlin's injury. That fact finder might also conclude that the duty was violated by the failure of Michelin and Cobre to remove the tires prior to McLaughlin's injury. McLaughlin certainly could argue that a reasonably prudent person, confronted with complaints such as these, would have removed the tires from the scraper and that the failure to do so constituted a violation of these defendants' duty to act as a reasonably prudent person

would under the circumstances. A genuine issue of material fact is structured by the record that should have been presented to a jury for determination in this instance. We, therefore, conclude that the district court improperly granted the summary judgment on that theory of negligence, and the case also must be reversed for that reason.

The summary judgment granted by the district court is affirmed with respect to McLaughlin's theories of recovery founded in negligence in manufacture or design of these tires, strict products liability in tort with respect to these tires, and breach of an express warranty or an implied warranty of merchantability. The failure of McLaughlin to produce evidence of an actual defect prevents recovery under those theories as a matter of law. With respect to the theories of negligence for failing to remove the tires and the implied warranty of fitness for a particular purpose, we do find genuine issues of material fact in the record that justify presentation to a jury. The case is reversed and remanded for further proceedings in accordance with the opinion of the court.

URBIGKIT, J., filed a specially concurring and dissenting opinion.

URBIGKIT, Justice, specially concurring and dissenting.

## I. STATUS OF CASE ON APPEAL

Following adverse summary judgment on a scraper driver's lawsuit claiming serious physical injuries caused by improperly performing equipment tires, this court considers his dismissed claims asserting liability for:

1. negligent manufacture and design of the tire by the manufacturer (Michelin);[1]

---

1. A factual issue is presented by the record whether specific appellee, Michelin Tire Corporation, either manufactured or designed the XRDNA ** radial tire which is the subject of this litigation. In a 1986 supplemental witness designation statement made about two years after the litigation started, Michelin advised in regard to the prospective testimony of a witness:

In addition, these witnesses will testify concerning the classification of the earth mover when used in reclamation industry as a work machine as opposed to a transport machine and that the choice of tires, for the unit 699 was appropriate. Also that Michelin Tire Company was not the manufacturer of this tire. It was designed by Manufacture Frances

2(a). strict liability for injury producing performance of a faulty product (Michelin);

2(b). strict liability for injury producing performance of a faulty product (dealer/supplier Cobre Tire);

3(a). express warranty of the product (Michelin);

3(b). express warranty of the product (Cobre Tire);

4(a). implied warranty violation of fitness for purpose intended (Michelin);

4(b). implied warranty violation of fitness for purpose intended (Cobre Tire);

5(a). failure to warn (Michelin);

5(b). failure to warn (Cobre Tire);

6(a). negligent delayed removal (Michelin); and

6(b). negligent delayed removal (Cobre Tire).

The trial court granted summary judgment on all eleven claims. The majority affirms the summary judgment injury claim denials resulting from the faulty tires for the complaints of negligent manu-

facture and design of Michelin Tire Corporation (Michelin); strict liability—Michelin and Cobre Tire; implied warranty of merchantability—Michelin and Cobre Tire; and express warranty—Michelin and Cobre Tire and then reverses the trial court on implied warranty of fitness for the purpose intended as to both the manufacturer and dealer and negligence in delayed removal as to both manufacturer and dealer. I concur in reversal of the summary judgment decision of the trial court on implied warranty of fitness for the purpose intended and negligence in delayed removal. I concur also that facts were lacking as sufficient to deny summary judgment for express warranty application.

## II. ISSUE OF DISSENT

This leaves for my disagreement and dissent summary judgment absolution of claims of negligent manufacture and design by Michelin and strict liability for furnishing a faulty product—Michelin and Cobre Tire.[2]

---

Pneumatiques and manufactured by S.A. Neumaticos Michelin.

This affiliate or subsidiary manufacturer status was neither addressed by affidavit nor made a subject of argument in the motion for summary judgment. Cf. *Torres v. Goodyear Tire & Rubber Co., Inc.*, 867 F.2d 1234 (9th Cir.1989).

This record and the scope of Michelin Tire Corporation litigation would suggest that this appellee is an American tire distributor and that actual manufacture is probably done by affiliates or subsidiaries in Europe. The special order status of these particular tires makes this case unusual within the broad coverage of a considerable number of defective tire cases of which Michelin is represented in part to include: *Johnson v. Michelin Tire Corp.*, 812 F.2d 200 (5th Cir.1987); *Edwards v. Sears, Roebuck and Company*, 512 F.2d 276 (5th Cir.1975); *Rhodes v. Michelin Tire Corp.*, 542 F.Supp. 60 (E.D.Ky.1982); *Cavallaro v. Michelin Tire Corp.*, 96 Cal.App.3d 95, 157 Cal.Rptr. 602 (1979); *Alexander v. Michelin Tire Corp.*, No. C–325, 979, 5 PLLR 38 (Cal. Los Angeles County Super.Ct. 1985); *Jensen v. Michelin Tire Co.*, No. 299048, 3 PLLR 11 (Cal. Orange County Super.Ct.1983); *Michelin Tire Corp. v. Crawford*, 170 Ga.App. 359, 317 S.E.2d 336 (1984); *St. Paul Fire & Marine Ins. Co. v. Michelin Tire Corp.*, 12 Ill. App.3d 165, 298 N.E.2d 289 (1973); *Vaughn v. Michelin Tire Corp.*, 756 S.W.2d 548 (Mo.App. 1988); *Coulter v. Michelin Tire Corp.*, 622 S.W.2d 421 (Mo.App.1981), *cert. denied* 456 U.S. 906, 102 S.Ct. 1752, 72 L.Ed.2d 162 (1982); *Co-*

*ley v. Michelin Tire Corp.*, 99 A.D.2d 795, 472 N.Y.S.2d 125 (1984); and *Ilosky v. Michelin Tire Corp.*, 307 S.E.2d 603 (W.Va.1983).

Since the differentiated relationship between marketer and manufacturer was not pursued in trial court process or appellate briefing, it is assumed for purposes of this dissent that a Restatement (Second) of Torts § 400 (1965) inclusion can be applied as the law of the case. *See* Restatement (Second) of Torts, *supra*, § 400, which states that "[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." *Laaperi v. Sears, Roebuck & Co., Inc.*, 787 F.2d 726 (1st Cir.1986); *Connelly v. Uniroyal, Inc.*, 75 Ill.2d 393, 27 Ill.Dec. 343, 389 N.E.2d 155 (1979), *cert. denied and appeal dismissed* 444 U.S. 1060, 100 S.Ct. 992, 62 L.Ed.2d 738 (1980).

**2.** The distinction between manufacturing defects and design defects has been explained by many legal scholars as well as in numerous judicial opinions. A clear explanation was given by Professor James Henderson, Jr.:

"Manufacturing flaws are imperfections that inevitably occur in a typically small percentage of products of a given design as a result of the fallibility of the manufacturing process. A flawed product does not conform in some significant aspect to the intended design, nor does it conform to the great majority of products manufactured in accord-

Within this majority's denial and my dissent on issues of negligent manufacture and design and strict liability are presented the most fundamental concepts of products liability—negligence, strict liability and warranty. It is the reasoning why the majority chooses to insulate liability and I select responsibility for bad tires and consequent injury in that analysis of theory and concepts of product liability that presents our serious differences.

## III. RELEVANT FACTS IN SUMMARY JUDGMENT REVIEW

Within this summary judgment appeal, a relatively simple course of events is presented; although at trial, the entire scenario would likely be factually contested. Management for Bridger Coal Company (Bridger), a strip mining coal producer, wondered whether radial tires might provide benefit, in part to provide a softer ride for operator and equipment, for usage on its large earth mover scrapers, in this case a Caterpillar 631D, model unit number 699. Fred McLaughlin, appellant, was the normal operator for that unit. Cobre Tire was a tire supplier under contract to Bridger on an as needed tire purchase arrangement. Cobre Tire and Bridger first discussed the experimentation with radial tires and Cobre Tire then went to Michelin to see what product they might have which could be applied to the strip mine usage at the Bridger facility. As a result, Michelin tires were provided for testing and experimentation for front wheel installation on the Caterpillar scraper, as well as another brand of radial tires for other equipment. No history of prior use of this brand of Michelin tires on equipment of this type and heavy character of strip mining operation existed. It was recognized to be an experiment with the tires.

The tires unquestionably did not perform satisfactorily following initial installation and attempts to modify performance in a number of ways also failed. In general application, as later indicated in the resulting accident and injury, it appeared that the tires lacked sidewall stability for the character of usage and ballooned and contracted causing forceful vibration and shaking of the equipment during hauling operations. On a particularly rough dirt pick up pass, the bouncing and ballooning of the tires catapulted appellant, like a rider on a Brahma bull, into the framework and glass of the scraper cab resulting in his complex permanent injuries, which became the subject of this physical injury lawsuit.

With factual record including evidence of continued notice of disclosed failure of tire performance given to both Cobre Tire and Michelin, we are called to test the summary judgment decision that a products liability, negligence or warranty claim of the liability of Michelin and Cobre Tire to appellant cannot be stated when it is alleged and factually supported by evidence that:

1. The purpose for which the tires were to be used were known to Michelin and Cobre Tire in advance of purchase;

2. The character of the work and requirement for tire usage was also known to Cobre Tire and Michelin for on-the-job experimental testing without previous use on this kind of equipment and operation in the anticipation that if tested favorably, additional tires of like character could be marketed to the coal company;

3. The experiment continued too long and, in failure of the tires to perform properly, the injury to appellant resulted;

4. The tires were not suitable for the purpose intended and were faulty when used in that circumstance; and

ance with that design.... [On the other hand, products with a design defect] are unusually dangerous because of the manner in which they are designed and marketed. Therefore, [a product defectively designed] conforms to the intended design and is substantially identical in relevant aspects to all the other unflawed products manufactured according to the same design or marketed in the same manner."
Henderson, *Judicial Review of Manufacturers' Conscious Design Choices: The Limits of Adjudication*, 73 Colum.L.Rev. 1531, 1543 (1973). Comment, *Product Liability: The Problem of the Non–Designing Manufacturer*, 9 U. Dayton L.Rev. 81, 81 n. 1 (1983).

5. Rather than a manufacturing defect encompassing abnormal production characteristics, the "defect" was a design result from the performance characteristic of the tires which had been untested for use for which they were sold and lacked a performance characteristic sufficient to avoid danger and ultimate injury to users of the product.

It is within this factual framework which is determined for summary judgment status review that the majority denies as a matter of law that negligence in design can be applied, that strict liability for product causing injury is inapplicable, and that the implied warranty of merchantability cannot be impressed.

## IV. MAJORITY DECISION

Shorn of facade and covering, the basis of the majority's decision is simplistic in separate application to each of the denied recovery theories. It is the thesis that if the tires would have performed properly somewhere in a different usage, they are without defect in this case, even though completely unsuitable here. Defect is defined as a general suitability for some use, although completely unsuitable for the purpose for which they were actually sold in the case where the injury resulted. Defect, the majority apparently opines, requires a denial of any usability standard as a mistake in manufacture and ignores either design defects or defects for the purpose for which the product was sold. The illogic in this posture and the inconclusiveness of its application to cause and effect in injury is absolutely astounding. This is apparent in reversal of summary judgment denial of the claim of liability for breach of warranty of fitness for the purpose intended while affirming dismissal on the issue of defect for strict liability and negligence. The observed defect in warranty is consequently excluded as a basis for liability as a defect for tort.

No one is called to question within this record that these tires did create danger even though used for the purpose for which they were sold. Like dynamite, danger does not exist unless the percussion cap is affixed. Unfortunately, danger was created by the sale of the tires for use on equipment for which appropriate testing had not been previously made. A comparison would be if extra-heavy loaded cartridges designed for special weapons were sold to an owner of a Saturday-night special. A properly designed product for a very confined use might become extremely dangerous if supplied to and sold by the local dealer for use in the inappropriate handgun. Tragic results might realistically occur, although the buyer would never be aware that the cartridge he purchased had a performance characteristic of great danger for his usage.

## V. CONFLICTING THESIS OF DISSENT

The improvidence of majority non sequitur is in denial that a defect in the Michelin tires occurred with attempted use as the specific purpose for which they were acquired. I cannot agree in any concept that a wrong product is not a defective product for the purpose of strict liability or for negligence in design or manufacture. It is recognized that a similar non sequitur was stated by this court in *Buckley v. Bell*, 703 P.2d 1089 (Wyo.1985) but, as we shall see, the cases cited in support of that proposition do not fit the broad statement made here where the tires were sold for a defined purpose and, when furnished to the buyer, failed in required performance even when regularly used. The fact that a submarine may be properly designed for usage in water does not mean that it is without defect for substitution as a tank. Most likely, the converse would also be unworkable and dangerous to the user. Consequently, the strange conception of the majority only provides half of the equation for logical analysis. The denied second half of the equation is merchandising for an intended purpose for which use of the product was dangerous because of lack of prior testing or improvidence of design.

Not dissimilar in concept is the infusion in litigation recently resulting from major injuries in the use of all-terrain vehicles— the ATV catastrophe of disabling injuries. *See Antley v. Yamaha Motor Corp.,*

*U.S.A.*, 539 So.2d 696 (La.App.1989). Use of the ATV on level surfaces and with casual speeds in the character of chasing golf balls on grassy courses is fairly safe to the user. The vehicles, however, are sold for all terrain and to go at significant speeds. It is in the expected use and anticipated and designated speeds that the pestilence of tens of thousands of serious injuries have pervaded products liability litigation. The product is both defective and dangerous in anticipated use, although the foreign manufacturer accurately assures the buyer that each unit will operate properly to its full capacity at high speed.

The destroyed straw man of the absence of defect is similarly employed fallaciously by the majority to deny statement of a claim for recovery on the thesis of both negligence and implied warranty of merchantability. Even though purchase for an intended and committed use directly applies to warranty for fitness for the purpose intended, wherein the majority agrees with me in application of the concept of the sale for a specific use, that does not extricate the availability of warranty of merchantability since it is within the parameters of that commercial transaction that merchantability is defined. There may be purposes for which asbestos may still be merchantable, but certainly not as school insulation. Defect for intended use denies the explication of general merchantability when that use is known in advance. Is a special order product defective if it does not perform? Is a mouse trap defective when sold to catch pack rats which are known to be resistent to anything but a .22 shot or a .410 blast? Is the fluid pump defective when it will suitably work with crude oil but not for molasses for which it had been sold? In the nature of logic, every product has some useful function, albeit as a doorstop, and every product has uses for which it is inappropriate, like gasoline from a can used to start a fireplace fire. It may work, but it may burn more than the wood in the fireplace.

## VI. WYOMING'S THEORETICAL DEPARTURE BY BUCKLEY V. BELL

The starting point for analysis requires a revisit to *Buckley*, 703 P.2d 1089 from which this majority extrudes its present conclusion that defectiveness is confined to deviation in character and not failure in performance in assigned purpose. I would reject *Buckley* as authority for this decision on five bases. First, that three-to-two decision lacks logic in applied analysis in any regard. Second, the decision in fact can be distinguished in *ratio decidendi* and the wrong-product concept was only dictum in broad analysis. Third, the precedent cited in *Buckley* to support the conclusion will not support the conclusion made in factual analysis. Fourth, Wyoming's more recent cases in first adopting strict liability in essence supercede *Buckley*. Finally, the special order status of this present case is fundamental in differentiating analysis.

In *Buckley*, 703 P.2d at 1090, the issue stated by the court was "whether the foreseeability of negligent conduct by a plaintiff occurring subsequent to the negligent acts of a defendant is a question of law or a question of fact." That portion of the case addressed proximate cause. Buyer had ordered gas for his gas motor hay baler and was furnished diesel fuel. In purging the diesel fuel from the machine after removal, the engine backfired, ignited available gas on the ground and burned up the baler. The second issue was contention that the trial court erroneously concluded that diesel fuel could not be a defective product under Restatement (Second) of Torts § 402A (1965). The opinion considered that the restatement had not been adopted and the court was foreclosed from adoption because as there stated:

First, our conclusion that the district court accurately resolved the causation factor prevents any application of the concept of strict liability. Second, even in view of the appellant's argument that if an adulterated product is to be considered defective and lead to liability when unreasonably dangerous then a wrong product is one which should be considered as totally adulterated for purposes of determining whether it is defective, the authorities we have discovered seem to say that a wrong product is not

a defective product for purposes of strict liability. *Baptista v. St. Barnabas Medical Center*, 109 N.J.Super. 217, 262 A.2d 902 (1970), affirmed 57 N.J. 167, 270 A.2d 409 (1970). See also *Berkeley Pump Co. v. Reed–Joseph Land Co.*, 279 Ark. 384, 653 S.W.2d 128 (1983); *Montez v. Ford Motor Company*, 101 Cal.App.3d 315, 161 Cal.Rptr. 578 (1980); and *Dambacher by Dambacher v. Mallis*, [336] Pa.Super. [22], 485 A.2d 408 (1984). Finally, it does not seem that a strict products liability theory is recognized as an appropriate vehicle for recovery of an economic loss, which is the only injury in this instance in light of the resolution of the causation factor. *Hart Engineering Company v. FMC Corporation*, 593 F.Supp. 1471 (D.R.I.1984). Singularly or collectively these concepts foreclose any reliance upon the doctrine of strict liability as articulated in Restatement (Second) of Tort, § 402(A), in this case.

*Buckley*, 703 P.2d at 1094–95.

Consequently, the trial court resolution came on independent cause proximately causing the damage and failure of proof of defective product. The decision in first discussing proximate cause and the reasoning and logic employed has no application here. *Cf. England v. Simmons*, 728 P.2d 1137 (Wyo.1986) (Urbigkit, J., dissenting). A fair analysis of the case is found in Note, *Torts—Should a Plaintiff's Intervening Act Be An Absolute Defense Under Comparative Negligence? Buckley v. Bell*, 703 P.2d 1089 (Wyo.1985), XXI Land & Water L.Rev. 591 (1986). It is the second two-paragraph disposition of the defective product definition under Restatement (Second) of Torts, *supra*, § 402A that *Buckley* presents relevance here. In *Buckley*, the two dissents analyzed the proximate cause concept to have been improperly applied and did not pursue the gratuitous address in the opinion regarding the nature of defect and question of economic damage, which peripheral problem now also comes to this court in yet another appeal. *Continental Insurance Company v. Page Engineering*, No. 87–295 (Wyo.1989), now pending in this court.

There are four cases upon which the Wyoming law is now hung as derived from precedential inclusion in *Buckley*. In *Baptista v. St. Barnabas Medical Center*, 109 N.J.Super. 217, 262 A.2d 902, *aff'd* 57 N.J. 167, 270 A.2d 409 (1970), a blood transfusion operation *may* have caused the death. Improper cross-matching *may* have caused the blood problem. On the record, the blood was wholesome and free from internal defects and the hospital followed recognized standard practices and testing. The appellate court refused to adopt a rule that would

> make a hospital an insurer of what are in essence medical services and opinions, * * *. The obligation of hospitals in cross-matching and typing blood in cases of blood transfusions should continue to be as it is now, grounded and expressed in a duty to exercise reasonable competence and care.

*Id.* 262 A.2d at 907. The factual difference between the reasoning employed and the decision made and any principle that defectiveness is not a wrong product is self-evident. The area of inquiry was reasonable effort to determine the kind of blood required and furnished.

*Berkeley Pump Co. v. Reed–Joseph Land Co.*, 279 Ark. 384, 653 S.W.2d 128 (1983) involved capacity designated irrigation water pumps. Performance was not achieved in quantity produced. The user was sued by the dealer for purchase price. The user counterclaimed for damages resulting from insufficient production and the dealer third-partied in the manufacturer whose performance curve statistics had been used to complete the sale. User recovered about $680,000 and the dealer was indemnified by the manufacturer and also awarded litigative costs. The dealer was given judgment for pump purchase price. On appeal, the manufacturer argued that strict liability was not applicable in contention: (1) where the product, in spite of any defective condition, does not constitute an unreasonable danger to person or property, or (2) in the absence of injury to persons, such defect causes purely economic loss.

That appellate court found "no evidence that the defectiveness of Berkeley's pumps rendered them dangerous—inadequate and dysfunctional, to be sure, but not dangerous." *Berkeley Pump Co.*, 653 S.W.2d at 132. That decision also has no relevance to the present review since the issue considered was unreasonable dangerousness as found not to be presented. It was determined on appeal that the pumps were "not dangerous." *Id.* 653 S.W.2d at 132. Furthermore, the additional decision of breach of warranty of fitness for purpose intended requiring knowledge by the supplier/manufacturer brought that case into accord with all positions now advanced by this dissent.

The third case cited is from California, *Montez v. Ford Motor Co.*, 101 Cal.App.3d 315, 161 Cal.Rptr. 578, 579 (1980), where that court first said:

A plaintiff in an action for personal injuries in a products liability case is not required to elect whether to proceed on a theory of strict liability in tort or on a theory of negligence where the instructions on the two theories will not be confusing to the jury. (*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387, 93 Cal.Rptr. 769, 482 P.2d 681.) At issue in this appeal is whether the court's rejection of plaintiff's negligence instructions and its decision to instruct the jury solely on strict liability was prejudicial error.

Factually, the injury resulted from missing a curve in driving at perhaps a 59 mile per hour speed where safe operation extended only from 17 to 27 miles per hour and "[p]laintiff's case was limited to a manufacturing defect. She did not rely on either a defect in design or the failure to warn." *Montez*, 161 Cal.Rptr. at 582. An adverse jury verdict was sustained, although that appellate court said a definitional instruction for defect should have been given but the jury was not confused in its absence since "the jury was capable of determining whether a defect in fact existed based upon the evidence. Their conclusion that one did not exist is amply supported by the record." *Id.* at 583.

That case is not relevant for the *Buckley* citation.

The last case cited, *Dambacher By Dambacher v. Mallis*, 336 Pa.Super. 22, 485 A.2d 408 (1984), *appeal dismissed* 508 Pa. 643, 500 A.2d 428 (1985), is one of a line of Pennsylvania cases providing a comprehensive analysis of products liability. *Dambacher* was a case which interestingly involved a radial tire. The simple issue, but very comprehensively pursued, was "that the tire was defective because it was not embossed with a warning not to mix it with other non-radial tires, and that the accident occurred because the tire was mixed with non-radial tires." *Id.* 485 A.2d at 411. The decision rested on the qualification of expert witnesses which had been used for the successful plaintiff's verdict and further analysis considered the proper instruction for retrial. The technical question was what happens when a radial tire is mixed with non-radial tires on a passenger vehicle as a "mixed fitment." *Id.* at 414. The appellate court in *Dambacher* first denied the dealer's motion for judgment not withstanding the verdict and reversed for retrial instead. That court then determined that qualified expert testimony was required that the mixed fitment was a proximate cause of the accident.

Suppose, for example, that A sells a bottled drink to B, and B pours the drink into a glass filled with ice-cubes, becomes ill, and sues A for selling a product defective because the bottle's label failed to include a warning not to mix the drink with ice-cubes. B will not make out a case for the jury unless he proves that mixing ice-cubes with the drink did in fact make him ill. If the mixing did not make B ill, there was no need to warn against the mixing, and therefore no defect in the bottle's label. Assuming, however, that appellees are able to present competent evidence of proximate cause at a new trial, that is, that they do offer the testimony of qualified experts, the issue will then arise whether appellant's radial tire was defective because it was not embossed with a warning not to mix it with non-radial tires. In that

event, what will be the trial court's responsibility?

*Id.* at 420.

*Dambacher* was an inadequate warning case as a concept not presented here, but that court clearly recognized in opinion text that intended use was a direct constituent of the zone of responsibility within strict liability concepts.

In a products liability case, such as this case, in contrast, the defendant—the manufacturer or supplier of the product—is not an "insurer" but "effectively the guarantor of his product's safety." *Salvador v. Atlantic Boiler Co.,* 457 Pa. 24, 32, 319 A.2d 903, 907 (1974). The plaintiff must therefore prove that the product that caused his injury was defective, or "unsafe for its intended use." *Id.* If the defendant were the insurer of its product, liability would follow upon a finding that the plaintiff was injured while using the product: the fact that injury occurred would lead to the conclusion that the product was unsafe in *some way*. But the jury is not to find liability when the product is unsafe in some way; liability may be imposed only on proof that the product lacked an element necessary to make it *safe* for its *intended use*.

\* \* \*

\*   \*   \*   \*   \*   \*

Finally, in a negligence case the plaintiff must prove, not only that the product was defective and that the defect caused his injury, but in addition, that in manufacturing or supplying the product the defendant failed to exercise due care.

*Id.* at 424 (emphasis in original).

That court then announced as part of the proposed instruction:

"This means that you must decide whether, as the plaintiffs contend, the radial tire supplied by the defendant was unsafe for its intended use because it lacked a warning that it should not be mixed with non-radial tires. If you find that because it lacked such a warning, the tire was unsafe for its intended use, then you should find it defective."

*Id.* at 430.

Consequently, *Dambacher* stands for the proposition that defectiveness can be established by being unsafe for its intended use and has nothing to do with wrong product absolution which would have been directly contrary to its remand result. See also Justice Wieand's concurring and dissenting opinion where he stated:

A product may also be deemed defective even though it comports in all respects to its intended design. It may be defective because of a defect in the design of the product. In *Azzarello v. Black Bros. Co., supra* [480 Pa. 547, 391 A.2d 1020 (1978)], the Supreme Court held that a supplier must provide a product "which is designed to make it safe for the intended use. Under this standard, the jury may find a defect where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for its intended use."

*Id.* at 433–34.

This reference brings into focus the course of earlier Pennsylvania cases including *Azzarello v. Black Bros. Co., Inc.,* 480 Pa. 547, 391 A.2d 1020 (1978) and *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975). Those cases recognized that defect was not limited to a flaw, fault or blemish in manufacture or fabrication, but rather addressed status of "danger" in usage. The court in *Azzarello,* 391 A.2d at 1026 further said that "we must look to whether the product is safe for its intended use." Intended use is consequently intrinsic in consideration of dangerousness and this becomes particularly pertinent as here when we have a special order product supplied for a narrowly confined, known, explicit use. See Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss.L.J. 825, 830 (1973), where Professor Wade stated:

The "something wrong" may have come about quite unintentionally because of a miscarriage in the manufacturing process, so that the product was not what it was intended to be; it may, on the other hand, have come about, even though the product was exactly as it was intended to

be, because of a poor design or the failure to attach a warning or suitable instructions.

The author further recognized:

> [I]t is only when something has gone wrong with the manufacturing process and the product is not in the condition in which it was intended to be that there is any significant difference. In the case of the improper design which makes the product dangerous, whatever is enough to show that it is so dangerous that strict liability should apply * * * will also be enough to show negligence on the part of the manufacturer. Even if the manufacturer is not aware of the danger created by the bad design, he is negligent in not learning of it.

*Id.* at 836–37 (footnote omitted).

The more recent history of *Buckley* lends no strength to its defectiveness definition credibility. Strict liability has since been adopted in *Ogle v. Caterpillar Tractor Co.*, 716 P.2d 334 (Wyo.1986). The only reference to *Buckley* in that case was:

> First, they [manufacturer] argue that strict liability in tort is not available as a cause of action in Wyoming since this court has declined to adopt the doctrine on several occasions. See e.g., *Buckley v. Bell*, Wyo., 703 P.2d 1089 (1985).

*Ogle*, 716 P.2d at 341. In *Bettencourt v. Pride Well Service, Inc.*, 735 P.2d 722 (Wyo.1987), the case was cited to a proximate cause rule. In a dissent in *Mostert v. CBL & Associates*, 741 P.2d 1090 (Wyo. 1987), it was cited for an intervening cause discussion. In this court's last case, *Sims v. General Motors Corp.*, 751 P.2d 357 (Wyo.1988), which was the second case to apply strict liability, no *Buckley* citation was included at all. Furthermore, no other state has found cause to cite the opinion as authority.[3]

3. None of the four cases included in the *Buckley* opinion as authority were cited by either party in appellate briefing for that appeal and the concept that a product unsuitable for purpose intended cannot be faulty was not directly argued in appellate presentation. Appellee, as distributer, argued only that the product was nei-

## VII. EVIDENCE OF DEFECTIVENESS

A product is designed for specific uses, and if it is properly made but unsuitable for its intended use, its design is faulty. In *Smith v. Fred Meyer, Inc.*, 70 Or.App. 30, 687 P.2d 1128, 1129 (1984), the court observed:

> If a product is unsuitable for its intended use, and as a result is unreasonably dangerous, then the correct inquiry is whether there is a manufacturing or design defect, not whether the manufacturer should have warned of the defect.

This statement by the Oregon court is consistent with the general standard defining a product to be defective when it fails to perform reasonably and safely the function for which it was intended. *Valentine v. Ormsbee Exploration Corp.*, 665 P.2d 452, 462 (Wyo.1983).

It is not necessary to prove a specific defect, and while proof of the failure or malfunction of an article standing alone is insufficient to prove that a product was defective, it is a strong circumstance to consider along with the remaining facts. *Valentine*, 665 P.2d at 462. In *Valentine*, 665 P.2d at 462, we quoted with approval the rule enunciated in *Tweedy v. Wright Ford Sales, Inc.*, 64 Ill.2d 570, 2 Ill.Dec. 282, 357 N.E.2d 449, 452 (1976):

> "A prima facie case that a product was defective and that the defect existed when it left the manufacturer's control is made by proof that in the absence of abnormal use or reasonable secondary causes the product failed 'to perform in the manner reasonably to be expected in light of [its] nature and intended function.'"

*See also Sims*, 751 P.2d 357. To similar effect is the language found at 1 American Law of Products Liability 3d § 3:5 at 13 (1987):

> For a product to be found defective in a products liability action, it is not al-

ther dangerous nor defective because plaintiff had come to know that it was fuel oil and not gasoline before the injury occurring accident happened. The citation of authority of *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963) in conjunction with that statement is informative.

ways necessary that there be proof of a specific, particular underlying defect. If the plaintiff has no evidence of a specific defect in the design or manufacture of the product, the plaintiff may offer evidence of its malfunction as circumstantial proof of the product's defect; * * *. [Footnotes omitted.]

In *Stewart v. BF Goodrich Co.*, 153 Ill. App.3d 1078, 107 Ill.Dec. 40, 506 N.E.2d 783, 785, *appeal denied* 116 Ill.2d 576, 113 Ill.Dec. 318, 515 N.E.2d 127 (1987), the court said that "[f]or circumstantial evidence to make out a *prima facie* case, it must tend to negate other reasonable causes, or there must be an expert opinion that the product was defective." (Emphasis in original.) It has also been held that "[t]estimony of the user or operator of the product as to the circumstances of the event is sufficient to establish malfunction." *Farmer v. International Harvester Co.*, 97 Idaho 742, 553 P.2d 1306, 1312 (1976). *See Clarke v. Brockway Motor Trucks*, 372 F.Supp. 1342 (E.D.Pa.1974) and *Greco v. Bucciconi Engineering Co. v. Wean Engineering Co.*, 283 F.Supp. 978 (W.D.Pa.1967), *aff'd* 407 F.2d 87 (3rd Cir. 1969). In *Farmer*, 553 P.2d at 1312, the Idaho Supreme Court said:

A distinction need not be drawn between a "defect" and a "malfunction." Proof of malfunction is circumstantial evidence of a defect in a product since a product will not ordinarily malfunction within the reasonable contemplation of a consumer in the absence of a defect.

## VIII.  PRESENT EVIDENCE OF DEFECT

In accord with the general authorities, I follow the foregoing syllogism that for a product sold for an intended function or performance purpose, defect is failure in that performance. In support of their motions for summary judgment, Michelin submitted and Cobre Tire relied on the affidavit of expert witness Charles Sons, a tire expert who had worked for Caterpillar Tractor Company for over 25 years. In his affidavit, Mr. Sons stated:

After having examined the tires involved in this accident, and having witnessed the various tests performed at the scene of the accident and also having examined the Largent photographs depicting the scene of the accident, I am of the opinion that there was no defect in either design or manufacture of the Michelin tires installed upon unit 699 upon which Mr. McLaughlin was injured.

In addition, Michelin submitted excerpts from the deposition of James Lipari, a Bridger employee, indicating appellant's scraper had hit a rock which precipitated the bouncing resulting in the accident. Also, Michelin submitted an excerpt from the deposition of appellant's expert, Dale Bussman, in which Bussman indicated that he could not identify a specific design or manufacturing defect.

In opposition to the motion for summary judgment, appellant submitted depositions of employees and supervisory personnel of Bridger and depositions of representatives of Michelin and Cobre Tire, all stating that immediately upon replacing the prior bias tires with the Michelin radial tires on scraper 699, problems with performance of the tires were experienced and reported. The evidence indicated that no similar complaints were reported or problems observed as to the Bridgestone radial tires contemporaneously installed on scraper 696. Appellant, in his deposition, testified that he immediately noticed a difference in the operation of the scraper upon installation of the Michelin tires on March 10, 1983 and that he reported the problem to his supervisor at the first opportunity. Appellant stated that the new tires caused the machine to vibrate, bounce, and "[t]he whole thing would shake."

The depositions of other Bridger employees and supervisors were of similar effect. They indicated that all the operators who drove scraper 699 complained about the bounce and vibration after installation of the Michelin tires. James Lipari testified that six operators had complained of "enhanced bouncing" for weeks prior to the accident. Cobre Tire's on-site tire man, Larry Farwell, testified that he received complaints about the tires' performance

within a few days of their installation and he relayed the information to his supervisor, Kenneth Moe, and to Gary Workman of Michelin in Salt Lake City. Workman recommended varying the tire air pressure, which was done with no noticeable curative effect. Farwell testified that he rode in the scraper with appellant on March 30 and found the ride to be bumpy, with the vibration problem continuing. Farwell reported this information to Workman who suggested removing the tires from scraper 699 and trying them on another machine. On April 4, 1983, the day before the accident, Moe, Cobre Tire's division manager, instructed Farwell to remove the Michelin tires from the scraper as soon as some replacement tires were received. Moe, in his deposition, stated that he ordered the tires removed for the reason of "customer satisfaction." The atmosphere of operational problems is similar to the circumstance of combined problems found in *Greco*, 283 F.Supp. 978.

On the date of the accident, while appellant was doing reclamation work with scraper 699 to remove overburden and fill depressions, operator Keith Nichols, from observations of appellant's scraper just prior to the accident, stated that every time appellant hit a rock or a bump the tires deflected and that the tires were flattening out to the extent that the distance from the bottom of the tire to the rim was only about six inches, and then they would spring back so that the distance from the rim to the bottom of the tire was two and one half feet.

In describing the accident, Lipari said "he came down past me making his cut. * * * Keith [Nichols] came in behind him, and the next thing I knew I could see the scraper bouncing real hard. I saw it bounce three or four times." Appellant, in his deposition, said that "[t]he scraper shook sideways and bounced up and down, and that's really all I can describe of it. * * * I feel that on either running over a rock or in a hole, it started bouncing sideways."

Lipari also testified that after the accident, he drove scraper 699 back to the shop and "it bounced excessively." After the accident, a test was conducted on the tires by removing them from scraper 699 and placing them on identical scraper 696. Operator Justin Webster, who then drove scraper 696 during that test with the Michelin tires on it, testified that "with the Michelin tires on it, they would—it wouldn't smooth out near as fast, and it gave me a feeling of losing a bit of control on it, especially after a sharp bump or a hole, it would feel like I was losing it a little bit." Larry Largent, a supervisor for Bridger, also testified about the test, stating that scraper 696 bounced and vibrated more when the Michelin tires were put on it than it had before.

In addition to this testimony, appellant submitted the deposition of mechanical engineer, Dale Bussman, as an expert witness. Mr. Bussman testified that the tires were defective in that placement of these tires on scraper 699 was the wrong application for the tires. Bussman also seemed to draw a distinction between the tire being defectively designed as opposed to unsuitable for their intended use, a discrepancy noted by Michelin and Cobre Tire. Again, I perceive this as a distinction without a difference. In any event, viewing the evidence in the light most favorable to appellant, I note the following observations made by Mr. Bussman in his deposition:

It's just that in this particular case we had a defective tire that was on this machine and it gave excessive vibration which resulted in a loss of control.

* * * * * *

* * * Now, relative to the question of whether it was a defective manufacture, I mean, maybe—and I don't know this, and it really doesn't matter, because we know the tire gave the excessive vibration in this particular case—perhaps it was defectively manufactured, okay, I don't know that. And I really don't care. All I know is that the tire gave excessive vibration which resulted in the loss of control.

In presentation where the evidence submitted regarding the alleged defectiveness of the Michelin tires was conflicting, appellant's materials submitted in opposition to

the motion for summary judgment were surely sufficient to structure a genuine issue of material fact as to defectiveness.

## IX. DEFECTIVENESS AS A STANDARD WHERE INTENDED USE IS SPECIFIC

*Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 899 (1963) presented a shopsmith woodworking machine that, without manufacturing defect, was demonstrably dangerous when used for its intended purpose as a matter of design:

Plaintiff introduced substantial evidence that his injuries were caused by defective design and construction of the Shopsmith. His expert witnesses testified that inadequate set screws were used to hold parts of the machine together so that normal vibration caused the tailstock of the lathe to move away from the piece of wood being turned permitting it to fly out of the lathe.

Whether carriage set screws vibrated loose or the tires in this case bounced excessively makes little difference in liability theory when the user is injured by the occurrence. An access step for the use of the driver in climbing up on a Caterpillar tractor likewise presents an opportunity for assessed liability from negligent design when it collected mud upon which the user slips and is injured. *Gonzales v. Caterpillar Tractor Co.,* 571 S.W.2d 867 (Tex. 1978). See affirmed judgment on remand in *Caterpillar Tractor Co. v. Gonzales,* 599 S.W.2d 633 (Tex.Civ.App.1980). A similar result was obtained in *Phillips v. Kimwood Mach. Co.,* 269 Or. 485, 525 P.2d 1033 (1974), although the case turned on the duty to warn. The operator was injured by a fiberboard sander when the machine regurgitated a sheet back out into the operator where the operator was manually feeding since the automatic feeder attachment had not been purchased. That court considered a seller-oriented or use-oriented standard—where strict liability either "imposes what amounts to a constructive knowledge of the condition of the product," *Id.* 525 P.2d at 1036, or the user-oriented

standard of danger to the user beyond contemplation.

In the case of a product which is claimed to be dangerously defective because of misdesign, the process is not so easy as in the case of mismanufacture. All the products made to that design are the same. The question of whether the design is unreasonably dangerous can be determined only by taking into consideration the surrounding circumstances and knowledge at the time the article was sold, and determining therefrom whether a reasonably prudent manufacturer would have so designed and sold the article in question had he known of the risk involved which injured plaintiff.

*Id.* at 1037. The opinion further noted, although the involvement of defectiveness may be the same, that the issue has been raised in some courts concerning whether in this context there is a distinction between strict liability and negligence. The evidence which proves the one will almost always, if not always, prove the other.

It is our opinion that the evidence was sufficient for the jury to find that a reasonably prudent manufacturer, knowing that the machine would be fed manually and having the constructive knowledge of its propensity to regurgitate thin sheets when it was set for thick ones, which the courts via strict liability have imposed upon it, would have warned plaintiff's employer either to feed it automatically or to use some safety device, and that, in the absence of such a warning, the machine was dangerously defective.

*Id.* at 1038–39. See, however, an analysis of the difference in general development in Keefe and Henke, *Presumed Knowledge of Danger: Legal Fiction Gone Awry?,* 19 Seton Hall L.Rev. 174 (1989).

Likewise in this case, appellant could have been instructed to slow down his operational speed—undoubtedly unacceptable to the mine owner where quantity of material moved is everything. *See also Caterpillar Tractor Co. v. Beck,* 593 P.2d 871, 884–85 (Alaska 1979), where the court adopted a test from *Barker v. Lull Engi-*

*neering Co., Inc.,* 20 Cal.3d 413, 143 Cal. Rptr. 225, 573 P.2d 443, 454, 457 (1978) and stated:

The *Barker* test represents a composite of the most workable features of each of the other tests. The first prong of the *Barker* test—that a product is defectively designed if it fails "to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner"—incorporates notions of the implied warranty of fitness for reasonable use, a primary concept in the evolution of strict products liability, * * *.

The second prong of the *Barker* definition encompasses those situations, such as the lack of a safety device which is presented here, where the product satisfies ordinary consumer expectations as to its general use but is still "defective" in that its design exposes the user or bystander to "excessive preventable danger." [Footnotes omitted.]

As an instruction, that court stated:

Following the guidelines set by the *Barker* court, we hold that the trial court may instruct the jury that a product is defectively designed if:

"(1) the plaintiff proves that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) the plaintiff proves that the product's design proximately caused injury and the defendant fails to prove, in light of the relevant factors, that on balance the bene-

fits of the challenged design outweigh the risk of danger inherent in such design."

*Id.* at 886 (quoting *Barker,* 573 P.2d at 452).

In case definition, this appeal could be confined to the presented facts of special order merchandise which fails in the performance in anticipated usage. Generally, however, the unfortunate divisiveness of the erroneous theory presented here extrudes into or overlaps the entire issue of design defect product liability. It remains in analysis of law and fact that every product will have some desired and appropriate use (doorstop, perhaps) and other uses for which it would not be provident (killing houseflies with dynamite).

It is in the confluence of design defect special order merchandise as relating to strict liability, negligence and warranty that this decision crosses an almost unlimited number of products liability cases and review authorities; none of which in my analysis would justify the majority's decision.[4] My only concurrence with the majority is that a defect is required to present issues of strict liability, negligence or general warranty as well as fitness for the purpose intended. We differ in logic and analysis as to the definition of defect and particularly here with special order merchandise that fails to perform within anticipated usage. Under any theory of products liability, a plaintiff has the burden of proving (1) injury; (2) the product causing injury was defective; (3) the defect existed at the time the product left the defendant's

**4.** For tires and wheels alone, see 1 American Law of Products Liability 3d, Citator, *supra,* §§ 208–218 to which the following specific topics should be added: motor vehicles §§ 156–207 and construction equipment §§ 352–400. Confinement of the topic to only Caterpillar tractors and Michelin tires in itself provides an extended review. *See also* Annotation, *Products Liability: Admissibility of Expert or Opinion Evidence that Product Is or Is Not Defective, Dangerous, or Unreasonably Dangerous,* 4 A.L.R.4th 651 (1981); Annotation, *Products Liability: Modern Cases Determining Whether Product is Defectively Designed,* 96 A.L.R.3d 22 (1979); Annotation, *Products Liability: Liability for Injury or Death Allegedly Caused by Defective Tire,* 81 A.L.R.3d 318 (1977); Annotation, *Products Liability:*

*Product as Unreasonably Dangerous or Unsafe Under Doctrine of Strict Liability in Tort,* 54 A.L.R.3d 352 (1973); Annotation, *Products Liability: Proof of Defect Under Doctrine of Strict Liability in Tort,* 51 A.L.R.3d 8 (1973); Annotation, *Products Liability: Strict Liability in Tort,* 13 A.L.R.3d 1057 (1967); Annotation, *Manufacturer's Duty to Test or Inspect as Affecting His Liability for Product-Caused Injury,* 6 A.L.R.3d 91 (1966); 39 Am.Jur. Proof of Facts 2d *Defective Tire* 209 (1984); 17 Am.Jur. Proof of Facts *Automobile Tire Defects and Hazards* 81 (1966); H. Philo & A. Portner, *170 Million Defective Tires Per Year,* 12 Trial 50 (November 1976); and Bowman, *Design Defect Cases Defense Problems,* For the Defense 47 (1980).

control; and (4) the defective condition of the product proximately caused the plaintiff's injury. *Stewart*, 107 Ill.Dec. 40, 506 N.E.2d 783; *Moslander v. Dayton Tire and Rubber Co.*, 628 S.W.2d 899 (Mo.App. 1981); *Jolley v. General Motors Corp.*, 55 N.C.App. 383, 285 S.E.2d 301 (1982). See summarized analysis in 1 American Law of Products Liability 3d, *supra*, § 1:5.[5]

A product may be defective in three ways: (1) manufacturing flaw; (2) defective design; or (3) absence or inadequacy of warnings regarding the use of the product. *Valk Mfg. Co. v. Rangaswamy*, 74 Md.App. 304, 537 A.2d 622, 626, *cert. granted* 313 Md. 9, 542 A.2d 845 (1988); 1 American Law of Products Liability 3d, *supra*, § 3:7; W. Prosser and W. Keeton, The Law of Torts § 99 (5th ed. 1984). This court has previously quoted with approval the general definition of a defect, which states that "[a] product is defective when it fails to perform reasonably and safely the function for which it was intended." *Valentine*, 665 P.2d at 462 (quoting *Drier v. Perfection, Inc.*, 259 N.W.2d 496, 504 (S.D.1977)).

The various definitions of defect revealed by present research, however, confirm the following observation that "[t]he term 'defect' has been defined on a case-by-case basis and has not been found to be susceptible of any general definition or of a single definition applicable in all contexts." 2 American Law of Products Liability 3d, *supra*, § 17:5 at 13–14 (footnote omitted). Moreover, the elements of proof of a defect vary depending on which theory of recovery is pursued. *Id.* at § 3:7. *See* Keeton, *Product Liability and the Meaning of Defect*, 5 St. Mary's L.J. 30 (1973). *See also* Keefe and Henke, *supra*, 19 Seton Hall L.Rev. 174.

The defining concept throughout this analysis is that intended use is inextricably bound in defect in all cases with the possible exception of a malmanufactured product. It is axiomatically necessary to address intended use in relation to defect. In *Buckley*, would the court's conclusion have been the same if the tractor was designed for fuel oil and high test gasoline was furnished with the result that upon commencement of use, the equipment exploded and incinerated the buyer who did not know that the dealer's mistake had occurred?

Unfitness for the purpose intended, which is a function of design defect, has been a singular constituent of modern products liability litigation.[6] Although not

5. Paul D. Rheingold in *Proof of Defect in Product Liability Cases*, 38 Tenn.L.Rev. 325 (1971) described six types of proof: (a) the nature of the product; (b) the pattern of the accident; (c) the life history of the product; (d) similar products and uses; (e) elimination of alternative cause; and (f) the happening of the accident. This scenario of proof accurately applies to the physical injury to appellant considered in this lawsuit. See also Note, *Products Liability and the Problem of Proof*, 21 Stan.L.Rev. 1777 (1969).

6. Singularly attractive to the academic inquiry of law school review as well as consideration by representatives of the practicing bar, the now 30-year period of the emergence of product liability litigation and evaluation has been accompanied by a convulcade of law journal reviews. Included in part among the singularly recognized analyses in research and scholastic leadership moving from status to prognosis would include: Franklin, *When Worlds Collide: Liability Theories and Disclaimers in Defective-Product Cases*, 18 Stan.L.Rev. 974 (1966); Green, *Strict Liability Under Sections 402A and 402B: A Decade of Litigation*, 54 Tex.L.Rev. 1185 (1976); Keeton, *supra*, 5 St. Mary's L.J. 30; Kee-

ton, *Manufacturer's Liability: The Meaning of "Defect" in the Manufacture and Design of Products*, 20 Syracuse L.Rev. 559 (1969); Keeton, *Products Liability—Proof of the Manufacturer's Negligence*, 49 Va.L.Rev. 675 (1963); Peairs, *The God in the Machine*, 29 B.U.L. Rev. 37 (1949); Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)*, 69 Yale L.J. 1099 (1960); Rapson, *Products Liability Under Parallel Doctrines: Contrasts Between the Uniform Commercial Code and Strict Liability in Tort*, 19 Rutgers L.Rev. 692 (1965); Wade, *supra*, 44 Miss.L.J. 825; Wade, *Strict Tort Liability of Manufacturers*, 19 S.W.L.J. 5 (1965); Comment, *Tort Defenses to Strict Products Liability*, 20 Syracuse L.Rev. 924 (1969); and Note, *Products Liability and Section 402A of the Restatement of Torts*, 55 Geo. L.J. 286 (1966).

Added to these single author sources are symposiums of significant detail which include: *Critical Issues in Tort Law Reform: A Search for Principles [Products Liability]*, XIV J. Legal Stud. 459 (1985); James, *General Products—Should Manufacturers be Liable Without Negligence?*, 24 Tenn.L.Rev. 923 (1957); and Symposium, *Current Developments in the Law of Torts*, 33 Vand. L.Rev. 549 (1980).

directly delineated within its true character to be a subset of design defect, special order merchandise which fails to function as intended fits immediately within the general principles and, specifically, the constituent policy of Restatement (Second) of Torts, *supra*, § 402A. This majority, in creating an illogical distinction unfounded in precedent and legal history that what is wrong is not defective, chisels out into the law a singular and significant mistake in basic analysis.

In the general history of recent law, modern products liability matured from *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916) in *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960), as followed by *Cepeda v. Cumberland Engineering Co., Inc.*, 76 N.J. 152, 386 A.2d 816 (1978), *overruled on other grounds sub nom. Suter v. San Angelo Foundry & Mach. Co.*, 81 N.J. 150, 406 A.2d 140 (1979); *Greenman*, 377 P.2d 897 and *Goldberg v. Kollsman Instrument Corp.*, 12 N.Y.2d 432, 240 N.Y.S.2d 592, 191 N.E.2d 81 (1963). See products liability symposium including articles by Professors John W. Wade, Page Keeton, Dix W. Noel and Robert E. Keeton, with introduction by Roy R. Ray to *Products Liability—A Symposium*, 19 S.W.L.J. 1 (1965).

*Greenman* involved a misdesigned power tool and *Cepeda* involved an industrial machine which "was defectively designed from a safety standpoint." *Cepeda*, 386 A.2d at 820. The case development in Pennsylvania provides a similar design defect development in fitness for the purpose intended. *Berkebile*, 337 A.2d 893 addressed a defectively designed helicopter.

"The seller must provide with the product every element necessary to make it safe for use." *Id.* at 902. It was then recognized in *Azzarello*, 391 A.2d at 1026, to apply to a bad design, "we must look to whether the product is safe for its intended use." *See also Dambacher*, 485 A.2d 408, which completes the concept development by application to radial tires which, as an item of commerce, were not defective but misapplied if mixed with non-radial tires on the vehicle. It was the intended use, onward in danger, where the accident was invited by the "mixed fitment." *Dambacher*, 485 A.2d at 414. The court specified that as a matter of law and would not rule that the radial tires were not defective, even if not defective when used with a full complement of other radial tires. It was the mixture of radial tires with non-radial tires which created the danger and consequent defect in product application. Intended use was the cornerstone of the liability thesis. *See likewise Ilosky v. Michelin Tire Corp.*, 307 S.E.2d 603 (W.Va.1983).

In direct application, this majority now disindigenously ignores as a legal principle the criteria that should have been applied:

The same principles should apply whether the manufacturing defect is due to error or mischance or design. Though the nature of the proof to demonstrate that the product was defective may differ, the ultimate jury test is the same. Suitability and safety are implicated whether the defect in the product is due to an imperfection in the material or improper design.

\* \* \* \* \* \*

Additionally, case notes and individual state reviews add comprehension to the nationwide products liability law developments. Dobbels, *Missouri Products Liability Law Revisited: A Look at Missouri Strict Products Liability Law Before and After the Tort Reform Act*, 53 Mo.L. Rev. 227 (1988); Noel, *Products Liability of Retailers and Manufacturers in Tennessee*, 32 Tenn.L.Rev. 207 (1965); Steenson, *Products Liability Law in Minnesota: Design Defect and Failure to Warn Claims*, 14 Wm. Mitchell L.Rev. 443 (1988); Swartz, *The Concepts of "Defective Condition" and "Unreasonably Dangerous" in Products Liability Law*, 66 Marq.L.Rev. 280 (1983); Comment, *Relevance of State of the Art Evidence in Design Defect Actions Under Section 402A*, 56 Miss.L.J. 801 (1986); Comment, *Products Liability in Oregon: Present and Future*, 8 Willamette L.Rev. 410 (1972); Note, *Torts—Wyoming Finds an Appropriate Case to Adopt Strict Products Liability. Ogle v. Caterpillar Tractor Co., 716 P.2d 334 (Wyo.1986)*, XXII Land & Water L.Rev. 223 (1987); Note, *Products Liability—Strict Liability in Tort—State-of-the-Art Defense Inapplicable in Design Defect Cases—Beshada v. Johns-Manville Products Corp., 90 N.J. 191, 447 A.2d 539 (1982)*, 13 Seton Hall L.Rev. 625 (1983); and Note, *Proof of Defect in a Strict Products Liability Case*, 22 Me.L.Rev. 189 (1970).

Delivery of an improperly designed machine constitutes delivery of a defective product. At that point, whether the cause of the defect in the product was due to design or otherwise is not material. See *Pike v. Frank H. Hough Co.*, 2 Cal.3d 465, 475, 85 Cal.Rptr. 629, 636, 467 P.2d 229, 236 (1970). Once the defect is established and the other elements shown, a case for strict liability has been made out.

*Suter v. San Angelo Foundray & Mach. Co.*, 81 N.J. 150, 406 A.2d 140, 152–53 (1979). The trial judge in *Suter*, 406 A.2d at 149 said that to hold defendant liable,

four elements had to be proved: (1) that the product had not been reasonably fit for the ordinary use for which it was intended; (2) that the defect arose out of defendant's design of the machine; (3) that the defect proximately caused plaintiff's injury or damage; and (4) that plaintiff was a reasonably foreseeable consumer or user of the product.

*See likewise Birchfield v. International Harvester Co.*, 726 F.2d 1131 (6th Cir. 1984); *Casrell v. Altec Industries, Inc.*, 335 So.2d 128 (Ala.1976), non-insulated "cherry picker;" *Seattle–First National Bank v. Tabert*, 86 Wash.2d 145, 542 P.2d 774 (1975); *Ulmer v. Ford Motor Company*, 75 Wash.2d 522, 452 P.2d 729 (1969); and Wade, *supra*, 44 Miss.L.J. 828.

The exhaustive exposition of strict liability in California cases also denies efficacy to what this majority does to Restatement (Second) of Torts, *supra*, § 402A, strict liability and general theories of product responsibility of both the manufacturer and the seller. *Cronin v. J.B.E. Olson Corp.*, 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153 (1972) developed from the situation which has factual similarity as a known intended use. An assembled bread truck as not unsafe in itself became faulty and dangerous by a defective hasp that permitted a bread tray to slide forward into the cab. When this hasp failed like the bouncing Michelin tires, the driver was injured from equipment which lacked fitness for the purpose intended, even though external forces in a street collision intervened.

Both cases present defective equipment as unsuitable for the purpose intended. See also *Bigbee v. Pacific Tel. and Tel. Co.*, 34 Cal.3d 49, 192 Cal.Rptr. 857, 665 P.2d 947 (1983), where a misdesigned and mislocated telephone booth, which was only unsafe at a car crash exposed location, resulted in injury to the plaintiff; and *Barker*, 573 P.2d 443, high-lift loader design defect. In similar regard, a fiberglass construction of a car roof affords question of design defect in *Brandenburger v. Toyota Motor Sales, U.S.A., Inc.*, 162 Mont. 506, 513 P.2d 268 (1973). The sheet metal used for duct work construction of a school created a similar fitness for intended purpose test in *Walters v. Kellam and Foley*, 172 Ind. App. 207, 360 N.E.2d 199 (1977). In that case, the sheet metal was not in itself unsafe or unsafe after the completion of installation, it was allegedly unsafe within the construction process for the activities of installers.

In *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519 (Tex.Civ.App.1979), there was at issue a crashed helicopter when a prior generation "unsafe" rotor blade broke in flight. As a strict liability and negligence consideration, duty to update and maintain for safe performance was at issue and liability resulted. See likewise *Montgomery Elevator Co. v. McCullough By McCullough*, 676 S.W.2d 776 (Ky.1984) and *Gonzales*, 571 S.W.2d 867.

Particularization of the individual use or lack of warning of product limitation provide similar authority within the forests of defective tire cases. In *Barth v. B.F. Goodrich Tire Co.*, 265 Cal.App.2d 228, 71 Cal.Rptr. 306 (1968), unwarned overload problems for tires when used on a station wagon provided a basis for liability. The buyer bought tires to do the job for the identified vehicles. Likewise, speed capacity was at issue in *Cavallaro v. Michelin Tire Corp.*, 96 Cal.App.3d 95, 157 Cal.Rptr. 602 (1979), although in result, the favorable verdict was reversed for retrial because of inconsistency in its turns. In Tenth Circuit Court of Appeals review, blowout proof tires that blew out were defective, *B.F. Goodrich Company v. Hammond*, 269 F.2d 501 (10th Cir.1959). A Mercury Cou-

gar operating at a speed above tire capacity but within car capacity, afforded a basis for liability up to tire blowout in *LeBouef v. Goodyear Tire & Rubber Co.*, 623 F.2d 985 (5th Cir.1980). The tires were safe enough, but not on a Mercury Cougar with a driver who tested the capacity of his car.

A case which is interestingly similar in the wrong item versus defect review is *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371 (Mo.1986). Proper parts were provided but, unfortunately, the activator for the airplane trim tabs for the left and right sides were installed on the wrong side with the disastrous result that follows. The appellate court adduced that:

> The core concern in strict tort liability law is safety. *See* Comments a through i to Section 402A. Therefore, the primary inquiry in a design defect case is whether the product—because of the way it is designed—creates an unreasonable risk of danger to the consumer or user when put to normal use. *See generally*, Owen and Montgomery, *Reflections On the Theory and Administration of Strict Tort Liability For Defective Products*, 27 S.C.L.Rev. 804, 812–13 (1976). To establish liability in a design defect case, the plaintiff bears the burden of demonstrating that the product, as designed, is unreasonably dangerous and therefore "defective," and that the demonstrated defect caused his injuries. Though obviously abbreviated, the foregoing explanation describes the heart and soul of a strict tort liability design defect case— unreasonable danger and causation.

> \* \* \* \* \* \*

Throughout the course of the entire trial, plaintiffs consistently focused on the existence of an industry design criteria standard—which was first brought to the jury's attention by mechanics Lane and Adams. The two terms used most often during the trial to describe this industry standard were "work or no go" and "murphy proof." Stated most simply, this industry standard calls for manufacturers like Beech to design critical flight parts in a way which makes it physically impossible to install them or assemble them in any way but the right way.

*Id.* at 375–79.

It is apparent that the synthesis of the Missouri Court would not comfortably fit within the wrong product delivery concept of *Buckley*. Likewise, the intervening cause contention might also be estranged. Wrong is defective and if damage results, causative. Airplanes provided with the wrong fuel is illustrative. For a case involving pickup tires for a camper unit, see *Farr v. Armstrong Rubber Company*, 288 Minn. 83, 179 N.W.2d 64, 69 (1970), which stated:

> A "defect" has been defined as any condition not contemplated by the user which makes the product unreasonably dangerous to him. A product is not in a defective condition when it is safe for normal handling and consumption. *Magnuson v. Rupp Manufacturing, Inc.*, 285 Minn. 32, 171 N.W.2d 201; *Greco v. Bucciconi Engineering Co.* (W.D.Pa.) 283 F.Supp. 978; Prosser, *The Fall of the Citadel*, 50 Minn.L.Rev. 791, 826; Restatement, Torts (2d) § 402 A, comments g, h, and i.

This definition of defect, appearing in cases involving strict liability in tort, is closely related to the concept of defect as it appears in cases dealing with breach of implied warranty. As stated in 2 Frumer and Friedman, Products Liability, § 16A[4][e]:

> "A breach of warranty may be proved if it is shown, by expert testimony or reasonable inferences from the circumstances, that a product is defective or injurious or failed in normal use and caused the injury complained of.

> "Is a product which causes damage under circumstances constituting a breach of warranty 'defective' for purposes of the rule of strict liability in tort? Would the same proof suffice? While not clear-cut, affirmative answers seem to be implicit in the cases."

## X. VIABILITY OF THE NEGLIGENCE CLAIM

In a products-liability action premised on negligence, as in any negligence action, the

plaintiff must prove the defendant breached a duty owed the plaintiff thereby proximately causing injury to the plaintiff. *Caterpillar Tractor Co. v. Donahue,* 674 P.2d 1276 (Wyo.1983); *Beard v. Brown,* 616 P.2d 726 (Wyo.1980). This court also determined in *Donahue* that as specific to a negligence products-liability action, the plaintiff must prove that the product was defective, that the plaintiff's injury was caused by a defect in the product, and that the manufacturer or seller failed to exercise due care. 5 F. Harper, F. James and O. Gray, The Law of Torts § 28.22 (2d ed. 1986). The existence of a duty is a question of law and unless reasonable men could not disagree, the question of whether the defendant exercised reasonable care and proximate cause is one for the trier of fact. *Bettencourt,* 735 P.2d 722.

The threshold inquiry, in a negligence context, is the nature of the duty that Michelin, as manufacturer/seller, and Cobre Tire, as supplier/seller, may have owed to appellant upon product sale. With respect to the duty of a manufacturer:

> We have previously recognized that a manufacturer owes a duty of care to those who use its product. The manufacturer is required to exercise reasonable care in the planning, designing, and manufacturing of a product in order to ensure that it is reasonably safe to use.

*Donahue,* 674 P.2d at 1280. As elaborated in defined duty:

> The manufacturer must exercise due care in the planning and design of the product, in its selection of materials, in the production or assembly process, in making reasonable tests and inspections to discover latent hazards involved in the use of its products, in preparing a product for the market, and in warning potential users of any dangers associated with the product. A manufacturer has a duty to know all of the hazardous qualities of its product and is responsible for making those hazards known to purchasers even when the product itself is not inherently dangerous.

1 American Law of Products Liability 3d, *supra,* § 10:14 at 27–28 (footnotes omitted). Further:

> A manufacturer has not necessarily satisfied its duty of care because its product functions as intended, since this would mean that there would be no liability for negligent design of a product which functioned as intended but which was designed in a fashion more dangerous than acceptable.

*Id.* at § 10:12 at 24.

The duty of care of a non-manufacturing seller is somewhat different. It is described generally as:

> Sellers of products of all kinds are subject to a duty of ordinary and reasonable care, that is, the duty to exercise the care that a prudent person in the same circumstances would exercise.

*Id.* at § 10:40 at 60 (footnote omitted). More specifically:

> Where the seller of an article reasonably must know that if it is defective it will be imminently dangerous to persons likely to come into contact with the article, the seller has a duty to use ordinary care to ascertain the condition of the article and to see that it is safe, especially where by representations or warranties that the article is safe the seller induces the sale. * * * A seller of a product manufactured by another is not presumed to have knowledge of a defect in the article sold, and if a product is received from a reputable source of supply the retail seller may assume that the manufacturer has done its duty in properly constructing the product and in not placing upon the market a product which is defective and likely to inflict injury, and is under no affirmative duty to inspect or test for a latent defect. * * *
>
> A seller will seldom be liable for negligent design, since design in most instances involves questions of specialized knowledge which the retailer cannot be expected to have.

*Id.* at § 10:40 at 61 (footnotes omitted).

In *Controlled Atmosphere, Inc. v. Branom Instrument Co.,* 50 Wash.App. 343, 748 P.2d 686, 690 (1988), that court said:

A seller of an item which was manufactured by a third party is not generally liable for harm caused by the dangerous character of the item if the seller did not know or had no reason to know the item was, or was likely to be, dangerous.

Pertinent to the facts of the instant case, however, is the observation that a higher than ordinary degree of care is required of a seller who installs or otherwise services a product. *See Kitchener v. Williams,* 171 Kan. 540, 236 P.2d 64 (1951).

Following discernment of an issue of defect, the next inquiry requires analysis whether a congruent factual issue exists regarding Michelin's alleged failure to exercise due care in placing these tires upon the market. Appellant contends that no evidence was presented by Michelin that they had tested these tires on this type of scraper nor was a tire history established. This contention has merit because, in a products-liability action based on negligence, if a product is shown to be defective, it may be inferred that the defect was due to negligence in the manufacture or inspection of the product. *Morris v. Chrysler Corp.,* 208 Neb. 341, 303 N.W.2d 500 (1981) and cases therein cited. Once negligence can be inferred, the burden of production of evidence to rebut the presumption shifts to the manufacturer. *Ballard & Ballard Co. v. Jones,* 246 Ala. 478, 21 So.2d 327 (1945). *See Davies v. Goodyear Tire & Rubber Co.,* 91 Mich.App. 347, 282 N.W.2d 172 (1978) and 1 American Law of Products Liability 3d, *supra,* § 14:2 at 13 and § 14:18 at 24.

In support of its motion for summary judgment, Michelin submitted the affidavit of Gary Workman. Workman testified that he had never received complaints or criticisms concerning the use of these specific Michelin radial tires in connection with earth-moving operations prior to the sale of Cobre Tire who, in turn, sold them to Bridger. He further testified that other customers had expressed satisfaction with the tires. It is observed, however, that evidence of no prior accidents is not admissible to prove due care. *Stokely–Van Camp, Inc. v. Ferguson,* 271 Ala. 120, 122 So.2d 356 (1959); *Edison v. Lewis Mfg. Co.,* 168 Cal.App.2d 429, 336 P.2d 286 (1959). I conclude that Michelin did not present sufficient evidence to exclude the inference of negligence. Summary judgment was inappropriate on the issue of Michelin's exercise of reasonable care in the design and sale of these tires **for this machine as involved in this use.**

The third criterion for liability within appellant's negligence theory invokes analysis of the nature of proximate cause. Proximate cause may be established by circumstantial evidence in conjunction with or in the absence of direct evidence. *Bettencourt,* 735 P.2d 722. This court has said that whether a breach of duty is a proximate cause of injury is a question of fact by the jury to determine unless the evidence demonstrates that reasonable minds could not disagree. *England,* 728 P.2d at 1143 (Urbigkit, J., dissenting); *McClellan v. Tottenhoff,* 666 P.2d 408 (Wyo.1983). In *Buckley,* 703 P.2d at 1091–92 (quoting *Lemos v. Madden,* 28 Wyo. 1, 200 P. 791, 794 (1921)), we defined proximate or legal causation as:

> [T]hat conduct which is a substantial factor in bringing about the injuries identified in the complaint. * * * [I]f the conduct is "that cause which in natural and continuous sequence, unbroken by a sufficient intervening cause produces the injury without which the result would not have occurred," it must be identified as a substantial factor in bringing about the harm.

In *McClellan,* 666 P.2d at 414, we observed that:

> [T]he ultimate test concerning proximate cause will be whether the vendor could foresee injury to a third person. * * *
>
> * * * * * *
>
> * * * A defendant is usually relieved of liability by an unforeseeable intervening cause. * * * However, an intervening cause does not relieve an earlier actor of liability if it was reasonably foreseeable.

Finally, we have said in regard to the grant of summary judgment upon the issue of causation in a negligence case that where

the discovery materials or unrefuted allegations disclose a duty and a breach of that duty, we treat the existence of the element of causation as more probable than its nonexistence; and we require the issue to be submitted to the trier of fact.

*Bettencourt,* 735 P.2d at 729.[7]

The evidence established that before the accident, Michelin and Cobre Tire were aware of and had made unavailing attempts to remedy the abnormal bounce and vibration problems associated with the dirt-hauling usage of the Michelin radial tires. Clearly, upon the evidence in the record, reasonable men could disagree as to whether negligence in sale as well as the tires was a proximate cause (related and reasonably related) of appellant's injury, and thus the claim of initial negligence in sale was not amenable to summary judgment. *Cf. England,* 728 P.2d 1137.[8]

## XI. VIABILITY OF A STRICT LIABILITY CLAIM

In trial pleading, appellant alleged both manufacturing and design defect and failure to warn. Upon appeal, appellant asserts Michelin and Cobre Tire are subject to strict liability on the basis that the tires were defective because they were unsuitable and unsafe for their intended use and defective because of the failure to warn. Again, I perceive the claim as presenting a case of design defect of product insufficiency for its intended use. *Cryts v. Ford Motor Co.,* 571 S.W.2d 683 (Mo.App.1978).

In *Ogle,* 716 P.2d at 344, we enumerated the elements in a products strict liability case that the

(1) * * * sellers were engaged in the business of selling the product that caused the harm;

(2) * * * product was defective when sold;

(3) * * * product was unreasonably dangerous to the user or consumer;

(4) * * * product was intended to and did reach the consumer without substantial change in the condition in which it was sold; and

(5) * * * product caused physical harm to the plaintiff/consumer.

*See also* 2 American Law of Products Liability 3d, *supra,* § 10:40 at 55–56 (citing *Ogle* ). The intrinsic elements of that strict liability claim are:

(1) injury resulting from a condition or defect of the product;

(2) condition of product was an unreasonably dangerous one; and

(3) condition or defect existed when product left defendant's control.

---

7. In the analysis of proximate cause as legal cause by this writer in dissent in *England,* 728 P.2d at 1152, Professor Keeton was quoted from *Causation,* 28 S.Tex.L.J. 231, 231–32 (1986):

> "There are four elements in a claimant's prima facie case of negligence. These generally recognized elements are: (1) a duty of reasonable care, (2) a breach of that duty, (3) proximate causation, and (4) damages. An explanation of the terms duty and breach of duty is necessary to identify the issues underlying each of the elements and the problems arising in connection with proximate cause.
>
> \*　\*　\*　\*　\*　\*
>
> "Generally, two elements are required to establish that the negligence of a defendant is the proximate cause of a plaintiff's injury: factual causation and legal causation. Factual causation refers to the requirement that the act and the injury be related. Legal causation refers to the requirement that the act and the injury be *reasonably* related." [Emphasis in original.]

An interesting current analysis of the subject of proximate cause in a particularized concept is presented in Steinbock, Richman and Ray, *Expert Testimony on Proximate Cause,* 41 Vand. L.Rev. 261 (1988).

8. In recent analysis, the Michigan court differentiated the negligence and warranty theories of recovery:

> An implied warranty of fitness grounded in tort is a warranty implied in fact or law. *Clancy v. Oak Park Village Athletic Center,* 140 Mich.App. 304, 306, 364 N.W.2d 312 (1985). The warranty theory of liability is distinguishable from the negligence theory in that negligence generally focuses on a defendant's conduct, while warranty focuses on the product itself. *Prentis v. Yale Mfg. Co.,* 421 Mich. 670, 692–693, 365 N.W.2d 176 (1984); *Smith v. E.R. Squibb & Sons,* 405 Mich. 79, 89, 273 N.W.2d 476 (1979).

*Callesen v. Grant Trunk Western R. Co.,* 175 Mich.App. 252, 437 N.W.2d 372, 378 (1989). Compare, however, D. Baker and J. Thompson, *Strict Liability Theory v. Negligence Reality,* 30 For the Defense 17 (Nov.1988).

*Ostendorf v. Brewer,* 51 Ill.App.3d 1009, 9 Ill.Dec. 780, 367 N.E.2d 214, 217 (1977); *Mays v. Ciba–Geigy Corp.,* 233 Kan. 38, 661 P.2d 348, 360 (1983). *See also* 2 American Law of Products Liability 3d, *supra,* § 16:42 at 57. In strict liability, the focus is on the nature of the product rather than the conduct of the defendant, and fault is not an element of liability proof. 63 Am. Jur.2d *Products Liability* § 532 at 730 (1984). The strict liability claim may be proven by circumstantial evidence. *Stewart,* 107 Ill.Dec. 40, 506 N.E.2d 783; *Moslander,* 628 S.W.2d 899. *See also Colorado Serum Co. v. Arp,* 504 P.2d 801 (Wyo. 1972), where this court utilized circumstantial evidence as predating adoption of strict liability in the 1986 *Ogle* case as such evidence is sufficient to make out a prima facie case if it tends to negate other reasonable causes or there is an expert opinion that the product was defective. *Lucas v. Firestone Tire & Rubber Co.,* 458 F.2d 495 (5th Cir.1972); *Stewart,* 107 Ill.Dec. 42, 506 N.E.2d at 785. *Mays,* 661 P.2d at 360 states that:

> Because liability in a products liability action cannot be based on mere speculation, guess or conjecture, the circumstances shown must justify an inference of probability as distinguished from mere possibility. While a plaintiff is not normally required to prove his case at the summary judgment stage, he must present some facts to support the elements of his claim.

Establishing the defectiveness of a product may be less difficult under strict products liability than under negligence. Professor Prosser stated:

> The bare fact that an accident happens to a product, that an automobile goes into a ditch, is usually not sufficient proof that it was in any way defective. * * * On the other hand, the addition of very little more in the way of other facts, as for example * * *, that the defect had given trouble before the accident, * * *

or the elimination of other causes, or the aid of expert opinion, may be enough to support the inference.

Prosser, *The Fall of the Citadel (Strict Liability to the Consumer),* 50 Minn. L.Rev. 791, 843–44 (1966) (footnotes omitted). Restatement (Second) of Torts, *supra,* § 402A, comment g provides:

> *Defective condition.* The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.

Unreasonably dangerous is defined as:

> *Unreasonably dangerous.* * * * The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.

Restatement (Second) of Torts, *supra,* § 402A, comment i.

The restatement definition of defect is known as the "consumer expectations" test. Fischer, *Tort Law: Expanding the Scope of Recovery Without Loss of Jury Control,* 11 Hofstra L.Rev. 937, 967 (1983). Under this test, strict liability may be imposed if the product is unsafe beyond the extent reasonably contemplated by the ordinary consumer. *Sims,* 751 P.2d 357; *Gomulka v. Yavapai Mach. and Auto Parts, Inc.,* 155 Ariz. 239, 745 P.2d 986 (1987); *Controlled Atmosphere, Inc.,* 748 P.2d 686.[9]

The "consumer expectations" test is substantially the same as the definition of defectiveness which was applied in discussion in appellant's negligence theory. The rule from *Valentine,* 665 P.2d at 462 (quoting *Tweedy,* 2 Ill.Dec. at 285, 357 N.E.2d at 452), is equally applicable under a strict liability theory (and under a warranty theory to be discussed infra):

---

9. Some jurisdictions, particularly in defective-design cases, have adopted a "risk-utility test" or a hybrid of the two tests, the "California Test." Vandall, *"Design Defect" in Products Liability: Rethinking Negligence and Strict Liability,* 43

Ohio St. L.J. 61 (1982); 2 American Law of Products Liability 3d, *supra,* § 17:24. This court has applied the restatement test rather than the risk-benefit theory. *Sims,* 751 P.2d 357.

"A prima facie case that a product was defective and that the defect existed when it left the manufacturer's control is made by proof that in the absence of abnormal use or reasonable secondary causes the product failed 'to perform in the manner reasonably to be expected in light of [its] nature and intended function.' "

Additionally, in a strict liability case, proof of causation requires proof that the unreasonably dangerous condition of the product must have been a producing cause of the harm. *Bell Helicopter Co.*, 594 S.W.2d 519; 63 Am.Jur.2d, *supra*, § 558; Restatement (Second) Torts, *supra*, § 402A(1). Proof of causation may be sufficient where the defect is demonstrated to be only a contributing cause and direct or circumstantial evidence which tends to exclude secondary causes establishes a prima facie case and a plaintiff need not disprove every cause of the injury other than the one alleged. *Ostendorf*, 9 Ill.Dec. 780, 367 N.E.2d 214.

The evidence submitted by appellant indicated that the tires bounced and vibrated excessively commencing with first use, and that before the accident, Bridger mechanics could not isolate any cause of the abnormal bounce and vibration of the scraper other than the claimed defective tires. With other evidence of normal use and an intended function of the tires, I conclude that under strict liability, appellant has presented a case structuring factual issues of the requisite liability elements sufficient to require a jury analysis of the contested evidence. *Davenport v. Epperly*, 744 P.2d 1110 (Wyo.1987).[10]

## XII. EXPRESS WARRANTY

Within my review of the warranty claim, I concur with the majority that a warranty of fitness for the purpose intended was properly stated in pleading and demonstrated for sufficiency to deter summary judgment. We differ because I also perceive that, for this special order merchandise, an implied warranty of merchantability is also properly presented. Again, I also agree that in this case an express warranty was not developed sufficiently enough to withstand summary judgment.

I begin by examining appellant's claim of breach of express warranty. W.S. 34–21–230 provides in relevant part:

(a) Express warranties by the seller are created as follows:

(i) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise[.]

In a products-liability case based on express warranty, the following elements must be established:

(1) an affirmation of fact or a promise by the seller; (2) the natural tendency of the affirmation or promise was to induce the buyer to purchase the goods; (3) such affirmation of fact or promise became a part of the basis of the bargain; (4) the buyer purchased the goods in reliance thereon; (5) a breach of the express warranty by the seller; and (6) the breach proximately caused injury to the plaintiff.

2 American Law of Products Liability 3d, *supra*, § 19:3 at 12 (footnotes omitted). Pursuant to W.S. 34–21–235, privity is not required in an action on either express or implied warranties. *Ogle*, 716 P.2d 334; *Western Equipment Co., Inc. v. Sheridan Iron Works, Inc.*, 605 P.2d 806 (Wyo.1980). W.S. 34–21–235 extends the warranties to "any person who may reasonably be expected to use, consume, or be affected by the goods and who is injured by breach of the warranty." The benefit of any express warranties, therefore, would flow to appellant as a user/consumer of the tires. Within the facts presented, I do not find either an affirmation of fact or a promise by either Michelin to Cobre Tire or Cobre

---

**10.** Down and dirty, as the expression goes, the jury will be called to decide constituencies in cause and resulting injury of terrain and working circumstance as affected or not affected by normal or abnormal tire behavior.

Tire to Bridger to support a factual issue as to express warranty.

A statement that equipment should be able to do a particular task contemplated by the buyer is not an express warranty that it will do so but mere[l]y a matter of opinion, as long as the circumstances are such that the statement is not regarded as a statement of a characteristic of the goods.

63 Am.Jur.2d, *supra*, § 463 at 626. *See Hauter v. Zogarts*, 14 Cal.3d 104, 120 Cal. Rptr. 681, 534 P.2d 377 (1975). We are confined by W.S. 34–21–230(b), which defines that "a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." *See Terry v. Moore*, 448 P.2d 601 (Wyo.1968). Entry of summary judgment on appellant's express warranty claims was appropriate.

## XIII. IMPLIED WARRANTIES

Appellant additionally contends, however, that Michelin and Cobre Tire breached both implied warranties of merchantability and fitness for a particular purpose. In part, I agree with the majority but do not exclude merchantability for this summary judgment review. W.S. 34–21–231(b)(iii) (U.C.C. § 2–314) provides that merchantable goods must be "fit for the ordinary purposes for which such goods are used." Goods are not fit for ordinary purposes where they are not fit for the expected or obvious purpose or are unsafe for use in a normal manner. *Huebert v. Federal Pac. Elec. Co.*, 208 Kan. 720, 494 P.2d 1210 (1972); *Performance Motors, Inc. v. Allen*, 280 N.C. 385, 186 S.E.2d 161 (1972). The elements a plaintiff must prove in a merchantability case pursuant to W.S. 34–21–231, (U.C.C. § 2–314) are: (1) that a merchant sold the goods; (2) which were not merchantable at the time of sale; (3) injury; (4) proximately caused by the defective nature of the goods; and (5) notice to the seller of the injury. J. White and R. Summers, Uniform Commercial Code § 9–6 at 343 (2d ed. 1980).

The evidence submitted by appellant discussed earlier was clearly sufficient to structure a triable controversy. Summary judgment on appellant's claims of breach of the implied warranty of merchantability **for the intended purpose** was improvidently granted as to both Michelin and Cobre Tire.

The implied warranty of fitness for a particular purpose is governed by W.S. 34–21–232 (U.C.C. § 2–315), which states:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

Additional conditions imposed for recovery under the warranty of fitness are: (1) the seller must have reason to know the buyer's particular purpose; (2) the seller must have reason to know that the buyer is relying on the seller's skill or judgment to furnish appropriate goods; and (3) the buyer must in fact rely upon the seller's skill or judgment. J. White and R. Summers, *supra*, § 9–9 at 358. A product is not fit for a particular purpose if it contains a dangerous characteristic that might cause injury when put to normal or foreseeable use or is unfit to perform its function safely when used in a normal manner. *Larsen v. General Motors Corp.*, 391 F.2d 495 (8th Cir.1968); *Brown v. Chapman*, 304 F.2d 149 (9th Cir.1962). *See also Ringstad v. I. Magnin & Co.*, 39 Wash.2d 923, 239 P.2d 848. (1952), where the question of the housewife using a "cocktail robe" while cooking created an issue of fact of normal usage and the court would not judicially notice what is normally worn in kitchens. The *Larsen* rule of foreseeability was adopted by this court in *Chrysler Corp. v. Todorovich*, 580 P.2d 1123 (Wyo.1978). With knowledge of intended special order use undisputed as to both Michelin and Cobre Tire, genuine issues of material fact exist on the implied warranty claim of fitness for a particular purpose as well as the parallel warranty of merchantability.

## XIV. CONCLUSION

The unnumbered product liability cases involving tires [11] encompass the broad perspective of one of the more numerous constituents of consumer injury litigation. As an integral contributor, theories and standards for liability of the vendor and manufacturer for defective tires accurately reflects the general status of present law. Factual categories include recapped tire cases [12], installation and mounting injuries [13], road driving blowouts,[14] and of particular relevance here, insufficiency of the tires for the intended purpose.[15] Application of the broad concepts of strict liability [16], negligence [17], express warranty [18], implied warranty of merchantability [19], and implied warranty of fitness for the purpose intended [20] are generally available through these cases to test claimed liability. It is in majority decision that defects in design cannot be related to warranty and purpose for which intended that the major mistake is now made in this decision by irrational evisceration of products liability principles. Whether phrased in consumer expectation [21] or unjustified risk in damage as an enterprise liability thesis,[22] see Keeton, *Products Liability—Liability Without Fault and the Requirement of a Defect,*

**11.** Annotation, *supra n. 4,* 81 A.L.R.3d 318; Annotation, *supra n. 4,* 51 A.L.R.3d 8; 39 Am.Jur. Proof of Facts 2d, *supra n. 4* at 209; 17 Am.Jur. Proof of Facts, *supra n. 4* at 81; 1 American Law of Products Liability 3rd, *supra* at §§ 208–218.

**12.** *Nebelung v. Norman,* 14 Cal.2d 647, 96 P.2d 327 (1939); *Craig v. Burch,* 228 So.2d 723 (La. 1969); *Beasock v. Dioguardi Enterprises, Inc.,* 117 A.D.2d 1015, 499 N.Y.S.2d 558 (1986); *Markle v. Mulholland's Inc.,* 265 Or. 259, 509 P.2d 529 (1973).

**13.** *Hale v. Firestone Tire & Rubber Co.,* 820 F.2d 928 (8th Cir.1987); *Nielson v. Armstrong Rubber Co.,* 570 F.2d 272 (8th Cir.1978); *Belue v. Uniroyal, Inc.,* 114 Mich.App. 589, 319 N.W.2d 369 (1982); *BFGoodrich v. Taylor,* 509 So.2d 895 (Miss.1987); *Coulter,* 622 S.W.2d 421; *Ewer v. Goodyear Tire and Rubber Company,* 4 Wash. App. 152, 480 P.2d 260 (1971).

**14.** *Gisriel v. Quinn–Moore Oil Corp.,* 517 F.2d 699 (8th Cir.1975); *Goodyear Tire & Rubber Co. v. Hughes Supply, Inc.,* 358 So.2d 1339 (Fla. 1978); *Firestone Tire & Rubber Co. v. Hall,* 152 Ga.App. 560, 263 S.E.2d 449 (1979); *Firestone Tire & Rubber Co. v. King,* 145 Ga.App. 840, 244 S.E.2d 905 (1978); *Stewart,* 107 Ill.Dec. 40, 506 N.E.2d 783; *Dawson v. Mazda Motors of America, Inc.,* 475 So.2d 372 (La.App.1985); *Vaughn,* 756 S.W.2d 548; *Brissette v. Milner Chevrolet Co.,* 479 S.W.2d 176 (Mo.App.1972); *Stang v. Hertz Corp.,* 83 N.M. 730, 497 P.2d 732 (1972); *Rome v. Kelly Springfield Tire Company,* 217 Va. 943, 234 S.E.2d 277 (1977). *Cf. Sears, Roebuck & Co., Inc. v. Haven Hills Farm, Inc.,* 395 So.2d 991 (Ala.1981).

**15.** *LeBouef,* 623 F.2d 985; *Hammond,* 269 F.2d 501; *Cavallaro,* 157 Cal.Rptr. 602; *Barth,* 71 Cal.Rptr. 306; *Dambacher,* 485 A.2d 408.

**16.** *Leonard v. Uniroyal, Inc.,* 765 F.2d 560 (6th Cir.1985); *Edwards,* 512 F.2d 276; *Hall,* 263 S.E.2d 449; *Nave v. Rainbo Tire Service, Inc.,* 123 Ill.App.3d 585, 78 Ill.Dec. 501, 462 N.E.2d 620 (1984); *Coulter,* 622 S.W.2d 421; *Stang,* 497 P.2d 732; *Markle,* 509 P.2d 529.

**17.** *Nielson,* 570 F.2d 272; *Baker v. B.F. Goodrich Co.,* 115 Cal.App.2d 221, 252 P.2d 24 (1953); *Bailey v. Montgomery Ward & Co., Inc.,* 635 P.2d 899 (Colo.App.1981); *Bridges v. Interstate Truck Leasing, Inc.,* 171 Ga.App. 361, 319 S.E.2d 531 (1984); *Craig,* 228 So.2d 723; *Walters v. Tire Sales & Service, Inc.,* 51 N.C.App. 378, 276 S.E.2d 729, *review denied* 303 N.C. 320, 281 S.E.2d 660 (1981); *Hewitt v. General Tire & Rubber Co.,* 3 Utah 2d 354, 284 P.2d 471 (1955); *Ewer,* 480 P.2d 260.

**18.** *Hansen v. Firestone Tire and Rubber Company,* 276 F.2d 254 (6th Cir.1960); *McCarty v. E.J. Korvette, Inc.,* 28 Md.App. 421, 347 A.2d 253 (1975).

**19.** *Smith v. Uniroyal, Inc.,* 420 F.2d 438 (7th Cir.1970); *Nave,* 462 N.E.2d 620; *Craig,* 228 So.2d 723. *Cf. Markle,* 509 P.2d 529.

**20.** *Lucas,* 458 F.2d 495; *Dagley v. Armstrong Rubber Co.,* 344 F.2d 245 (7th Cir.1965); *The Gray Line Co. v. The Goodyear Tire & Rubber Co.,* 280 F.2d 294 (9th Cir.1960); *Fruehauf Trailer Division v. Thornton,* 174 Ind.App. 1, 366 N.E.2d 21 (1977); *Davies,* 282 N.W.2d 172; *Smith v. Frontier, Inc.,* 53 Wash.2d 805, 337 P.2d 299 (1959).

**21.** *LeBouef,* 623 F.2d 985; *Edwards,* 512 F.2d 276 (Michelin Tire); *Cavallaro,* 157 Cal.Rptr. 602; *Barth,* 71 Cal.Rptr. 306; *Dambacher,* 485 A.2d 408.

**22.** *Johnson,* 812 F.2d 200; *Leonard,* 765 F.2d 560; *Smith,* 420 F.2d 438; *Nebelung,* 96 P.2d 327; *Vaughn,* 756 S.W.2d 548; *Crawford,* 317 S.E.2d 336; *Stewart,* 506 N.E.2d 783; *Joshua v. Fulton,* 498 So.2d 1132 (La.App.1986), *writ denied* 501 So.2d 230 (La.1987); *Taylor,* 509 So.2d 895; *Moslander,* 628 S.W.2d 899; *Coulter,* 622 S.W.2d 421; *Hewitt,* 284 P.2d 471. *Cf. St. Paul Fire & Marine Ins. Co.,* 298 N.E.2d 289.

41 Tex.L.Rev. 855 (1963), any differentiation between design[23] and manufacturing defect[24] as a distinction between wrongness because of operational insufficiency versus wrongness because what was needed was not provided is both illogically and precedentially unjustified. The court in *Coley v. Michelin Tire Corp.*, 99 A.D.2d 795, 472 N.Y.S.2d 125, 127 (1984) said that "[t]he defect may be inferred from proof that the product did not perform as intended by the manufacturer."

Although this majority now leaves appellant with a viable claim in implied warranty of fitness for the purpose intended and negligence of untimely removal, evisceration of strict liability, negligence in delivery for an intended purpose and implied warranty of merchantability are observedly unjustified. The philosophical underpinnings provided by *Buckley* upon which the majority builds its thesis of product liability are unsound. Consequently, the resulting structure is systematically misdirected and operationally skewed. The result, in function as an attribute of the justice delivery system, fails to get from here to there.

Consequently, I concur in reversal of the summary judgment on the issues granted, but dissent from suffocation of the normative products liability theories.

---

**23.** For example, see *Edwards*, 512 F.2d 276; *Nesselrode*, 707 S.W.2d 371; and Note, *Strict Products Liability: Missouri Moves Toward Absolute Liability*, 55 UMKC L.Rev. 434 (1987). *Cf.* Henderson, *Renewed Judicial Controversy Over Defective Product Design: Toward the Preservation of an Emerging Consensus*, 63 Minn.L.Rev. 773 (1979); Comment, *supra n. 2*, 9 U. Dayton L.Rev. 81; and Note, *Failures to Warn and the*

*Sophisticated User Defense*, 74 Va.L.Rev. 579 (1988).

**24.** *See Johnson*, 812 F.2d 200. *Cf. St. Paul Fire & Marine Ins. Co.*, 298 N.E.2d 289; Price & Roth, *Product Liability Defenses*, 39 FICC Quarterly 201 (1989); and Comment, *Tort Defenses to Strict Products Liability*, 20 Syracuse L.Rev. 924 (1969).